# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 3, 2021        Decided October 4, 2022

No. 21-5028

WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET
AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01170)

---

*John M. Miano* argued the cause and filed the briefs for appellant. *Dale L. Wilcox* entered an appearance.

*Julie Axelrod* and *Richard P. Hutchison* were on the brief for *amici curiae* Landmark Legal Foundation, et al. in support of appellant.

*Joshua S. Press*, Senior Litigation Counsel, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, and *Glenn M. Girdharry*, Assistant Director.

*Paul W. Hughes* argued the cause for intervenor appellees. With him on the brief were *Andrew A. Lyons-Berg*, *Daryl Joseffer*, *Paul Lettow*, and *Jason Oxman.*

*Leslie K. Dellon* was on the brief for *amici curiae* American Immigration Council and American Immigration Lawyers Association in support of appellees.

*Sean H. Donahue*, *Andrew D. Silverman*, and *Elizabeth R. Cruikshank* were on the brief for *amici curiae* FWD.us, et al. in support of appellees.

*Ishan K. Bhabha* was on the brief for *amicus curiae* The President's Alliance on Higher Education and Immigration in support of appellees.

*Megan C. Gibson* was on the brief for *amicus curiae* Niskanen Center in support of appellees. *Ciara W. Malone* entered an appearance.

Before: HENDERSON, TATEL,[*] and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and dissenting in part by *Circuit Judge* Henderson.

PILLARD, *Circuit Judge*:  Since before Congress enacted the Immigration and Nationality Act of 1952 (INA), the Executive Branch under every President from Harry S. Truman onward has interpreted enduring provisions of the immigration

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

laws to permit foreign visitors on student visas to complement their classroom studies with a limited period of post-coursework Optional Practical Training (OPT). A 1947 Rule allowed foreign students "admitted temporarily to the United States . . . for the purpose of pursuing a definite course of study" to remain here for up to eighteen months following completion of coursework for "employment for practical training" as required or recommended by their school. That program has persisted and been continually updated across the ensuing seventy years.

Today, over one million international students come to the United States each year on student visas, and over one hundred thousand of them complete a period of practical training. *See* U.S. Immigration and Customs Enforcement: Student and Visitor Exchange Program, 2021 SEVIS By the Numbers Report 2, 4-5 (April 6, 2022). The current Department of Homeland Security (DHS) OPT Rule authorizes up to one year of post-graduation on-the-job practical training directly related to the student's academic concentration, with up to 24 additional months for students in science, technology, engineering and mathematics (STEM) fields. The OPT Rule requires an applicant for practical training to be enrolled on a full-time basis at an authorized academic institution that requires or recommends it as directly related to the student's coursework. The practical training must be approved by both the school and DHS, the student must be registered with DHS as an OPT participant, and the student's practical training must be overseen by both the employer and the school.

The Secretary of Homeland Security promulgated the challenged OPT Rule pursuant to the Executive's longstanding authority under the INA to set the "time" and "conditions" of nonimmigrants' stay in the United States. 8 U.S.C. § 1184(a)(1). The Rule is an exercise of that authority over

foreign students authorized to enter the country on nonimmigrant F-1 student visas. 8 U.S.C. § 1101(a)(15)(F)(i). The time-and-conditions authority and the foreign student visa category were both already on the books when Congress conducted its in-depth review and synthesis of immigration law to enact the 1952 INA. Congress knew that the statutory powers it chose to preserve in that Act had long been used by the Executive to permit foreign students who had entered the United States in order to attend school to stay after graduation for a period of practical training as required or recommended by their school. Lawmakers have closely scrutinized the immigration laws many times since then. Congress has repeatedly amended the pertinent provisions. But it has never once questioned the statutory support for the Optional Practical Training program.

Washington Alliance of Technology Workers (Washtech) argues that the statutory definition of the F-1 visa class precludes the Secretary from exercising the time-and-conditions authority to allow F-1 students to remain for school-recommended practical training after they complete their coursework. But that argument wrongly assumes that, beyond setting terms of entry, the visa definition itself precisely demarcates the time and conditions of the students' stay once they have entered. Congress gave that control to the Executive. The F-1 definition tethers the Executive's exercise of that control, but by its plain terms does not exhaustively delimit it. We hold that the statutory authority to set the time and conditions of F-1 nonimmigrants' stay amply supports the Rule's OPT program.

The practical training opportunities the Rule permits reasonably relate to the terms of the F-1 visa. The INA's text and structure make clear that Congress intended the Secretary's time-and-conditions authority to be exercised in a manner

appropriate to the types of people and purposes described in each individual visa class—a constraint that the Secretary's overarching administrative-law obligations confirm. To be valid, the challenged post-graduation OPT Rule, including its STEM extension, must reasonably relate to the distinct composition and purpose of the F-1 nonimmigrant visa class. We hold that they do. The Rule closely ties students' practical training to their course of study and their school. OPT is time-limited, and the extension period justified in relation to the visa class. The record shows that practical training not only enhances the educational worth of a degree program, but often is essential to students' ability to correctly use what they have learned when they return to their home countries. That is especially so in STEM fields, where hands-on work is critical for understanding fast-moving technological and scientific developments.

Finally, Washtech sees another lack of statutory authority for the Rule: In its view, the Executive cannot authorize any employment at all, including for Optional Practical Training. That argument fails, too. As Congress itself has recognized, the Secretary's statutory authority to set the "conditions" of nonimmigrants' stay in the United States includes the power to authorize employment reasonably related to the nonimmigrant visa class. Authorizing foreign students to engage in limited periods of employment for practical training as their schools recommend according to the terms set out in the Rule is a valid exercise of that power.

As further explained below, we affirm the judgment of the district court sustaining the OPT Rule's authorization of a limited period of post-coursework Optional Practical Training, if recommended and overseen by the school and approved by DHS, for qualifying students on F-1 visas.

## I.  BACKGROUND

### A.

The INA sets the terms on which consular officers at U.S. embassies and consulates abroad may issue visas to both prospective "immigrants" and "nonimmigrants."  8 U.S.C. § 1201(a)(1).  "Immigrant" visas are issued to foreign nationals intending to move to the United States permanently.  "Nonimmigrant" visas are for foreign nationals seeking to come into the country temporarily for an identified purpose.  The INA's definitional section lists several dozen classes of foreign nationals who may be eligible for nonimmigrant visas.  8 U.S.C. § 1101(a)(15).  Those classes are often referred to by their clause number within subparagraph (a)(15) of section 1101.  For example, "A-1" visas grant entry to certain foreign dignitaries, "B-1" to business travelers, "H-1B" to persons in certain specialty occupations, "H-2A" to temporary agricultural workers, "I" to journalists, and "P" to certain types of visiting performers.  *See* 8 U.S.C. §§ 1101(a)(15)(A)(i), 1101(a)(15)(B), 1101(a)(15)(H)(i)(b) & (ii)(a), 1101(a)(15)(I), 1101(a)(15)(P).

An F-1 foreign-student visa may be issued to:

> an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United

States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn . . . .

*Id*. § 1101(a)(15)(F)(i). Like other visa classes defined in section 1101(a)(15), F-1 identifies entry conditions but "is silent as to any controls to which these aliens will be subject after they arrive in this country." *Rogers v. Larson*, 563 F.2d 617, 622-23 (3d Cir. 1977).

Those post-arrival controls are spelled out pursuant to section 1184(a)(1), providing the Executive authority to set the "time" and "conditions" of admission for nonimmigrant visa-holders, including those who enter the country with F-1 visas. Section 1184(a)(1) provides:

The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe . . . .

8 U.S.C. § 1184(a)(1); *see Rogers*, 563 F.2d at 622-23. The balance of section 1184(a)(1) affords the Attorney General the authority, as he "deems necessary," to require of any nonimmigrant

the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status

> subsequently acquired under section 1258 of this title [allowing change in nonimmigrant status], such alien will depart from the United States.

8 U.S.C. § 1184(a)(1).[1]  The INA authorizes the Secretary to "establish such regulations" as are "necessary for carrying out his authority under" the statute and enforcing its terms.  *Id.* § 1103(a)(1)-(3).

The INA thus defines categories of visa eligibility and empowers the Secretary, guided by those visa categories, to regulate how long and under what conditions nonimmigrants may stay in the country.

**B.**

Pertinent aspects of the INA's statutory framework date back nearly a century, to the Immigration Act of 1924.  In that Act, Congress established a student visa category materially the same as its modern F-1 counterpart, authorizing entry of "[a]n immigrant who is a bona fide student . . . who seeks to enter the United States solely for the purpose of study at an accredited school . . . which shall have agreed to report to the Secretary of Labor the termination of attendance of each immigrant student."  Immigration Act of 1924, Pub. L. No. 68-139, § 4(e), 43 Stat. 153, 155; *accord* 8 U.S.C.

---

[1] A note on nomenclature:  Section 1184(a)(1), which was enacted when the Immigration and Naturalization Service was housed in the Department of Justice, refers to the Attorney General.  That authority was transferred in 2002 to DHS so is currently exercised by the Secretary of Homeland Security.  At times we refer to either or both DHS or its United States Customs and Immigration Service (USCIS) and DOJ or its Immigration and Naturalization Service (INS) simply as the Executive.

§ 1101(a)(15)(F)(i). Then, as today, the Act specified that "[t]he admission to the United States" of what were then called "non-quota immigrants," including visiting students, would "be for such time as may be by regulations prescribed, and under such conditions as may be by regulations prescribed." Immigration Act of 1924 § 15, 43 Stat. at 162-63; *accord* 8 U.S.C. § 1184(a)(1). The 1924 Act authorized the Attorney General to require foreign students to post bonds to ensure compliance with any prescribed time and conditions. § 15, 43 Stat. at 163.

Congress has repeatedly reinforced that approach, with F-1 directly setting entry conditions and the Executive regulating the terms of stay pursuant to its statutory time-and-conditions authority. Congress made no changes across the intervening decades to disapprove post-graduation practical training, even as it overhauled other aspects of our immigration laws: The Immigration and Nationality Act of 1952 created the modern nonimmigrant categories—including the F-1 class—and restated both the basic eligibility criteria for student visas and the grant to the Executive of time-and-conditions authority over the terms of nonimmigrants' stay. *See* Immigration and Nationality Act, Pub. L. No. 82-414, §§ 101(15)(F), 214(a), 66 Stat. 163, 168, 189 (1952).

Since it overhauled immigration law in 1952, Congress has made some tweaks to the student visa and practical training regimes. It has, for example, authorized the noncitizen spouses and children of F-1 students to accompany them, Pub. L. No. 87-256, § 109(a), 75 Stat. 527, 534 (1961), required specific employment authorization and verification by employers for most noncitizens as a condition of their employment in the United States, Pub. L. No. 99-603, § 101, 100 Stat. 3359, 3360-74 (1986), and, after the September 11, 2001 attacks, strengthened the program for monitoring permissions and

approvals of foreign students' study in the United States, Pub. L. No. 107-173, §§ 501-502, 116 Stat. 543, 560-63 (2002). But Congress has left unchanged the key terms and basic framework that statutorily define visa categories and empower the Executive to specify by regulation the terms of nonimmigrants' presence in the United States.

The Executive has consistently exercised those enduring statutory powers to maintain and control the OPT program. From at least the 1940s onward, the Executive has used its statutory time-and-conditions authority to permit post-coursework employment as a form of practical training for student visa-holders. With key terms strikingly similar to the wording in the current OPT Rule, the 1947 rule governing students who were "admitted temporarily to the United States . . . for the purpose of pursuing a definite course of study" provided that:

> In cases where employment for practical training is required or recommended by the school, the [INS] district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month periods, but any such extensions shall be granted only upon certification by the school and the training agency that the practical training cannot be accomplished in a shorter period of time.

12 Fed. Reg. 5,355, 5,355, 5,357 (Aug. 7, 1947). The 1947 regulation authorized practical training to occur "after completion of the student's regular course of study." S. Rep. No. 81-1515, at 503 (1950).

The Executive has explicitly reaffirmed that understanding in regulations spanning a dozen presidential administrations: It has long used its statutory authority over the "time" of

nonimmigrant admission to set the length of F-1 visa-holders' permitted presence in the United States and the "conditions" they must meet while here.[2]  Rather than admitting F-1 students for a particular interval of time, DHS admits them for the "duration of [their] status."  8 C.F.R. § 214.2(f)(5)(i); *see id.* § 214.2(f)(7)(i).  Per DHS regulations, the duration of that status includes the time during which they are full-time students in approved courses of study.  *Id.* § 214.2(f)(5)(i).  And it includes standardized periods when they may be here under other, related conditions—for example, for up to a month before and two months after starting coursework, *id.* § 214.2(f)(5)(i), (iv), up to five months during approved gaps between educational levels, *id.* § 214.2(f)(5)(ii), (f)(8)(i), on vacation between terms, *id.* § 214.2(f)(5)(iii), and—the subject of this case—while they engage in capped periods of practical training after completion of coursework, *id.* § 214.2(f)(5)(i), (f)(10)(ii)(A)(3).

---

[2] *See, e.g.*, 34 Fed. Reg. 18,085, 18,085 (Nov. 8, 1969) (extending the availability of practical training from 6 to 18 months); 38 Fed. Reg. 35,425, 35,426 (Dec. 28, 1973) (reauthorizing the preexisting practical training regime); 42 Fed. Reg. 26,411, 26,413 (May 24, 1977) (permitting students in certain fields to engage in practical training "[a]fter completion of a course or courses of study"); 48 Fed. Reg. 14,575, 14,581, 14,586 (Apr. 5, 1983) (allowing practical training "after the completion of a course of study" regardless of degree program); 57 Fed. Reg. 31,954, 31,956 (July 20, 1992) (using the term "Optional [P]ractical [T]raining" for the first time to describe the temporary employment available to F-1 students); 81 Fed. Reg. 13,040, 13,041 (Mar. 11, 2016) (extending the OPT period for up to twenty-four months for F-1 students in STEM fields).  We discuss these regulations in further detail *infra* at 31-32.

## C.

Washtech challenges the Secretary's statutory authority to permit F-1 visa-holders who have completed their coursework to undertake a capped period of employment as a form of practical training—as recommended or required by their schools and approved by the Secretary. *See* 8 C.F.R. § 214.2(f)(5)(i). As already noted, OPT continues the Executive's longstanding policy of authorizing visiting students to work here in their field, under the auspices of their school, for a limited period to cement their classroom learning and ensure they can use that knowledge effectively at work when they return to their home countries. *See* 57 Fed. Reg. 31,954, 31,954-57 (July 20, 1992) (detailing the terms of OPT).

The regulations governing practical training allow approved students to remain in the United States for up to one year following completion of their course of study if they are "engag[ed] in authorized practical training." 8 C.F.R. § 214.2(f)(5)(i), (f)(10), (f)(11). In 2008, the Department promulgated a rule allowing F-1 visa-holders with STEM degrees to apply for an OPT extension of up to seventeen months. *See* 73 Fed. Reg. 18,944 (Apr. 8, 2008). The district court vacated that rule as unlawfully issued without notice and comment but stayed the vacatur to allow DHS to correct that error. *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech I*), 156 F. Supp. 3d 123 (D.D.C. 2015). In 2016, the Secretary did so, promulgating after notice and comment a renewed STEM practical training extension program. *See* 81 Fed. Reg. 13,040 (Mar. 11, 2016). We then vacated the district court's 2015 decision as moot. *See Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech II*), 650 F. App'x 13 (D.C. Cir. 2016). The 2016 Rule carries forward the existing allowance of up to a year of practical training related to the student's field of study and adds

an extension for STEM students of up to twenty-four months. *See* 81 Fed. Reg. at 13,041; 8 C.F.R. § 214.2(f)(10)(ii)(C).

The current OPT Rule defines the post-coursework practical training at issue here as follows:

(A) General. Consistent with the application and approval process in paragraph (f)(11) of this section, a student may apply to [United States Customs and Immigration Service] for authorization for temporary employment for optional practical training directly related to the student's major area of study. The student may not begin optional practical training until the date indicated on his or her employment authorization document, Form I-766. A student may be granted authorization to engage in temporary employment for optional practical training:

* * *

(3) After completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree (excluding thesis or equivalent). Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training. A student must complete all practical training within a 14-month period following the completion of study, except that a 24-month extension pursuant to paragraph (f)(10)(ii)(C) of this section [for STEM students] does not need to be completed within such 14-month period.

8 C.F.R. § 214.2(f)(10)(ii). The Rule limits post-coursework OPT to "an F-1 student who has been lawfully enrolled on a

full time basis, in a [United States Customs and Immigration] Service-approved college, university, conservatory, or seminary for one full academic year," allowing such a student to seek "employment authorization for practical training in a position that is directly related to his or her major area of study." *Id*. § 214.2(f)(10).

The preamble to the final rule explains that the "core purpose" of the challenged STEM OPT extension is to "allow participating students to supplement their academic knowledge with valuable practical STEM experience." 81 Fed. Reg. at 13,041. More specifically, the 24-month STEM extension will, according to DHS, "enhance [participating] students' ability to achieve the objectives of their courses of study by allowing them to gain valuable knowledge and skills through on-the-job training that may be unavailable in their home countries." *Id.* at 13,042-43. The rule also "improves and increases oversight over STEM OPT extensions" in order to further "guard[] against adverse impacts on U.S. workers." *Id.* at 13,040, 13,049.

To realize those purposes, the OPT Rule requires specific actions by students, schools, employers, and the government to design, approve, and monitor the practical training component for each participating student. First, a school administrator responsible for overseeing the education of F-1 students—the Designated School Official—must recommend the student to DHS as someone whose education will be enhanced by on-the-job practical training, and DHS must favorably adjudicate the application. 8 C.F.R. § 214.2(f)(10)(ii)(C)(3), (f)(11)(i)-(iii); *id.* § 214.3(*l*)(1). Second, the student and the school official must settle on a proposal for practical work "directly related to the degree that qualifies the student for" the extension—in this case, certain STEM degrees. *Id*. § 214.2(f)(10)(ii)(C)(4). Third, the student and the prospective employer must then

15

agree on a "training plan" that identifies the specific ways in which the practical training will enhance the participant's education. *Id.* § 214.2(f)(10)(ii)(C)(7). They must submit their agreed plan to the school's designated official for review and approval. *Id.* Finally, the prospective employer must attest, among other things, that the employment will help the student attain his or her training objectives, and that the student will not replace a full- or part-time temporary or permanent U.S. worker. *Id.* § 214.2(f)(10)(ii)(C)(10).

Once the student-trainees begin working, the school official continues to superintend the practical training; the students and their employers must periodically report back to the school with evaluations of the student's progress toward the training goals. *Id.* § 214.2(f)(10)(ii)(C)(9)(i). The Designated School Official must, in turn, submit the training plans and follow-up reports to DHS. *Id.* § 214.2(f)(10)(ii)(C)(9)(iii). DHS may, at its discretion, conduct site visits to ensure that employers are meeting program requirements. *Id.* § 214.2(f)(10)(ii)(C)(11). Recordkeeping obligations of the schools that are approved by DHS to enroll F-1 students include maintenance of records on each student reflecting "[w]hether the student has been certified for practical training, and the beginning and end dates of certification." *Id.* § 214.3(g)(1)(vii).

**D.**

Washtech challenged the 2016 OPT extension and underlying practical training regime as unlawful on several grounds. The district court dismissed the case. *Wash. All. Of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech III*), 249 F. Supp. 3d 524 (D.D.C. 2017). It held that Washtech had standing to challenge the 2016 Rule's extension of the maximum OPT period for STEM graduates, though not the

preexisting regime generally authorizing a year of post-graduation OPT. *Id.* at 535-54, 556. On the merits, the district court credited the government's argument that Washtech's "single, conclusory sentence" in its complaint asserting "that the 2016 OPT Program Rule exceeds DHS's authority" was "facially implausible given the absence of any alleged facts supporting this conclusory legal claim." *Id*. at 555. Because in opposing the motion to dismiss "Washtech failed to address" the government's arguments in support of its statutory authority, the district court treated the government's characterization as "conceded." *Id.* As for the APA challenge, the district court observed that "Washtech contends that the 2016 OPT Program Rule was implemented arbitrarily and capriciously because it 'requires employers to provide foreign-guest workers OPT mentoring without requiring that such program be provided to American workers.'" *Id*. (quoting the complaint). The district court rejected that argument as similarly "threadbare" insofar as it simply ignored "the extensive explanations provided in the 2016 OPT Program Rule, including the explanations provided in the notice of proposed rulemaking on which Washtech publicly commented . . . ." *Id.* at 556.

We reversed the dismissal of the statutory-authority challenge to the 2016 Rule, reasoning that by its nature "[a] claim that a regulation exceeds statutory authority" does not "require[] factual allegations about the defendant's actions" and that Washtech's complaint "plainly identifies the perceived disconnect between what the statute permits . . . and what the regulations do." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech IV*), 892 F.3d 332, 343-44 (D.C. Cir. 2018). Washtech could therefore "rest on its complaint" which "itself adequately states a plausible claim for relief," without thereby conceding that its claim was insufficiently pled. *Id.* at 345. We directed the district court on remand to consider

whether the 2016 Rule placed in issue not just the 2016 STEM extensions but, under the reopening doctrine, the Secretary's statutory authority to implement "the entire OPT program." *Id.* at 345-46.

Although Washtech had not timely challenged the underlying rule itself, the district court on remand held that the 2016 Rule restarted the clock to challenge the statutory authority for the OPT program as a whole along with the new, STEM-specific extension. *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech V*), 395 F. Supp. 3d 1, 10-15 (D.D.C. 2019). The district court also permitted the National Association of Manufacturers, Chamber of Commerce, and Information Technology Industry Council to intervene in support of DHS to defend the OPT Rule. *Id.* at 15-21.

Before us is the appeal of the district court's order granting summary judgment to DHS and the Intervenors. *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.* (*Washtech VI*), 518 F. Supp. 3d 448 (D.D.C. 2021). The district court held that Washtech had standing to challenge OPT, *id.* at 458-62, and that the program was within the Secretary's statutory authority, *id.* at 463-75. The court reasoned that the INA's text, together with decades of apparent congressional approval, sufficed to support the Department's interpretation that it had authority to allow post-graduation OPT. *Id.* The court also denied Washtech's motion to strike an amicus brief. *Id.* at 453 n.2.

## II.  ANALYSIS

### A.  Standard of Review

We review *de novo* the district court's grant of summary judgment, *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 942 F.3d 504, 508 (D.C. Cir. 2019), including its determinations

about the plaintiff's standing, *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011), and other legal conclusions, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).  A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For the reasons that follow, we affirm the judgment of the district court.

## B.  Standing

On the earlier appeal from dismissal of Washtech's case for failure to state a claim, we relied on allegations in the complaint to hold that the organization had standing. *Washtech IV*, 892 F.3d at 339-42.  Because Washtech at the summary judgment stage supplied evidence supporting the allegations we already held sufficient, we recognize its standing at this stage, too.  Washtech members submitted declarations in opposition to summary judgment confirming that they currently hold STEM jobs and that they have actively sought and been denied other STEM positions, including with employers that regularly hire OPT participants.  Under the legal standard established by binding circuit precedent, we hold that a reasonable jury could find on this record that Washtech suffered competitive injury in fact cognizable under Article III.

Because Washtech claims associational standing on behalf of its members, it must show that "(1) at least one of its members has standing to sue in her or his own right, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Save Jobs USA*, 942 F.3d at 508 (internal quotation marks omitted) (formatting modified).  Here, DHS contests only whether the

identified Washtech members have standing in their own right. We, too, focus our attention there.

To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). So, at the summary judgment stage, "the plaintiff 'must set forth by affidavit or other evidence specific facts' that prove standing." *Id.* (quoting *Defs. of Wildlife*, 504 U.S. at 561).

Here, Washtech asserts that its members have suffered injury based on the competitor standing doctrine. The "basic requirement" of competitor standing "is that the complainant must show an actual or imminent increase in competition" in the market in which he or she is a "direct and current competitor[]." *Washtech IV*, 892 F.3d at 339-40; *see Save Jobs USA*, 942 F.3d at 509-10; *Mendoza v. Perez*, 754 F.3d 1002, 1011-14 (D.C. Cir. 2014). The Supreme Court has long recognized that businesses may be "aggrieved" by increased competition in their sector. *See, e.g.*, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 157 (1970). And we have held that workers may likewise suffer injury from an action that increases competition for jobs in their labor market. *See Mendoza*, 754 F.3d at 1011; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 802-03 (D.C. Cir. 1985) (recognizing construction craftworkers' union standing based on allegations that, "under the guise of B-1 status, the

INS is allowing aliens into the country to perform work which would otherwise likely go to union members").

Even at the pleading stage, we recognized that "allegations of increased competition in the STEM labor market are supported by 'facts found outside of the complaint,'" including that 34,000 individuals participated in the STEM OPT extensions in 2016. *See Washtech IV*, 892 F.3d at 340. The district court on remand accepted as "undisputed" for summary judgment purposes "that the OPT program increases the amount of foreign labor in the STEM labor market." *Washtech VI*, 518 F. Supp. 3d at 461.

The dispute centers on whether Washtech's members are direct and current competitors in that labor market. We hold that they are. At the motion-to-dismiss stage, we deemed adequately alleged that Washtech members "compete with F-1 student visa-holders who are working in the OPT program pursuant to the DHS's regulations" and therefore that they "'participat[e] in the [STEM] labor market' in competition with OPT workers." *Washtech IV*, 892 F.3d at 339-40 (quoting *Mendoza*, 754 F.3d at 1013).

Washtech has now presented specific facts to support those allegations. All three member declarations show that the members have applied for many jobs within the STEM field and continue to work in that field now. J.A. 201-22. And the attachments to Mr. Sawade's declaration include copies of job postings stating that at least some of the STEM positions to which he applied were also advertised as open to OPT applicants. *Id.* 223-25. Thus, Washtech's members have sufficiently supported their allegations that they are direct and current competitors with OPT participants and have therefore suffered cognizable injury under the competitor standing doctrine.

The Department's objections to Washtech's standing fail here for the same reasons that they did at the motion-to-dismiss stage. The main thrust of DHS's argument is that the Washtech members have not provided evidence that they were, at the time Washtech initiated the suit, "*currently* competing with F-1 students receiving OPT" or "*currently* searching for" STEM jobs. Appellee Br. at 20, 25 (emphases in original). But because the "supply side of a labor market is made up of those individuals who are employed *and* those actively looking for work," *Save Jobs USA*, 942 F.3d at 511 (emphasis in original), Washtech's members can qualify as direct and current competitors even if they were not actively seeking new jobs at the time the suit commenced. To require evidence that Washtech's members were actively seeking a STEM job would "overread[] our 'direct and current competitor' formulation, which simply distinguishes an existing market participant from a potential—and unduly speculative—participant." *Id.* at 510; *see also Mendoza*, 754 F.3d at 1013-14. It is enough that nonimmigrant foreign workers "have competed with [Washtech's] members in the past, and, as far as we know, nothing prevents them from doing so in the future." *Save Jobs USA*, 942 F.3d at 511. Washtech has shown injury to its members that is cognizable under the competitor standing doctrine.

Those injuries are also traceable to the practical training rule and redressable by the relief Washtech seeks. As discussed above, there is little dispute that the 2016 OPT Rule has increased the labor supply in the STEM field. As we did at the motion to dismiss stage, we reject the Department's contention that Washtech's injury is not traceable to the Rule because employment involves the independent hiring or firing actions of third parties, *see* Appellee Br. at 19-20; we have already identified the cognizable injury as "exposure to increased competition in the STEM labor market—not lost

jobs, per se," *Washtech IV*, 892 F.3d at 341. And the relief Washtech seeks, a holding that the INA bars post-graduation practical training for F-1 visa-holders, would accordingly reduce competition in that market, likely redressing the harms that Washtech asserts. *See id.* at 341-42. As a result, we hold that Washtech has standing to sustain its challenge to the 2016 Rule's STEM extension.

## C.   Statutory Authority for Optional Practical Training

The 2016 Rule is within DHS's statutory authority. Section 1184(a)(1)'s time-and-conditions provision is the source of that authority, and the F-1 visa class definition guides its use. Because the 2016 Rule regulates the "time" and "conditions" of admission for F-1 visa-holders, and because it is reasonably related to the distinct composition and purpose of that visa class, as defined in the F-1 provision, the Secretary had authority to promulgate it.

## 1.

We begin with the source of the Secretary's authority. Congress granted the Executive power to set the duration and terms of statutorily identified nonimmigrants' presence in the United States. The INA provides that nonimmigrants' "admission to the United States . . . shall be for such time and under such conditions" as the Executive prescribes "by regulations." 8 U.S.C. § 1184(a)(1). The plain text of section 1184(a)(1) validates continued admission for periods of practical training specified in the Rule: The allowance of up to a year of practical training as recommended by the school and approved by DHS, with up to an additional 24 months for STEM graduates, is "time" that the Department has "by regulations" set for the duration of F-1 students' continued "admission to the United States" on the condition that they engage in qualifying practical training as the Rule defines it.

*See, e.g.*, *CDI Info. Servs., Inc. v. Reno*, 278 F.3d 616, 619 (6th Cir. 2002) (recognizing section 1184(a)(1)'s grant of authority over duration and terms of extension of nonimmigrants' stay). Section 1184(a)(1) thus empowers the Department to permit temporary, post-graduation practical training for F-1 visa-holders.

Section 1184(a)(1)'s interplay with the INA's definitions of admissible nonimmigrants reinforces that section 1184(a)(1) supports the OPT Rule. It provides time-and-conditions authority specifically for the "admission to the United States of any alien *as a nonimmigrant*." 8 U.S.C. § 1184(a)(1) (emphasis added). Notably, however, the INA does not define "nonimmigrant" as a general category, but only as a set of discrete classes. *Id.* § 1101(a)(15)(A)-(V). Those dozens of class definitions are each very brief, specifying little more than a type of person to be admitted and the purpose for which they seek to enter. No definition states exactly how long the person may stay, nor spells out precisely what the nonimmigrant may or may not do while here for the specified purpose.[3] Those are parameters that Congress expected the Executive to establish "by regulations," which is exactly what section 1184(a)(1) grants DHS the authority to do. In short: The INA uses visa classes to identify who may enter temporarily and why, but leaves to DHS the authority to specify, consistent with the visa class definitions, the time and conditions of that admission.

Here, the F-1 class definition serves as the Secretary's guide. It provides that the F-1 visa applicant must be a "bona

---

[3] Unlike F-1, two of the twenty-two nonimmigrant visa class definitions state the maximum allowable time of admission for that class. *See* 8 U.S.C. § 1101(a)(15)(Q) ("for a period not to exceed 15 months"); *id.* § 1101(a)(15)(R) ("for a period not to exceed 5 years"). Even those provisions do not dictate the time of admission that DHS could set within those limits.

fide student" who is "qualified to pursue a full course of study"; her purpose must be "to enter the United States temporarily" and to do so "solely for the purpose of pursuing such a course of study" at a DHS-approved U.S. academic institution. 8 U.S.C. § 1101(a)(15)(F)(i). This definition governs the decisions of consular and immigration officers who are responsible for granting visas and who must ensure that the qualified F-1 student's purpose in coming to the United States is genuinely for study. But the F-1 provision says nothing about when that visit should begin or end. *Id.* In fact, the provision cannot rationally be read as setting forth terms of stay. For example, F-1 requires that the prospective nonimmigrant must "seek[] to enter the United States." *Id.* Once admitted, an F-1 visa-holder cannot continuously "seek[] to enter the United States" throughout his or her stay. *Id.* The F-1 provision therefore sets the criteria for entry and guides DHS in exercising its authority to set the time and conditions of F-1 students' stay; it does not, itself, delineate the full terms of that stay.

Preexisting regulations applicable to F-1 visa-holders (and not at issue here) illustrate how this structure plays out. To allow F-1 students time for moving in and out of the country, Department regulations admit them into the United States for up to 30 days before their course of study begins, 8 C.F.R. § 214.2(f)(5)(i), and permit them to remain in the country for up to 60 days after it ends, *id*. § 214.2(f)(5)(iv). The rules also allow F-1 students to stay during periods of academic vacation between terms, *id.* § 214.2(f)(5)(iii), and even during gaps between entirely distinct educational programs, *id.* § 214.2(f)(5)(ii).

Washtech accepts that the Executive's time-and-conditions authority empowers it to authorize students' presence in the United States beyond the time they are actually

enrolled in and attending classes. Oral Arg. Tr. at 15-16. But it claims the 2016 Rule goes too far. We disagree. Where Congress has delegated general authority to carry out an enabling statute, an agency's exercise of that authority ordinarily must be "'reasonably related' to the purposes of the legislation." *Doe, 1 v. Fed. Election Comm'n*, 920 F.3d 866, 871 (D.C. Cir. 2019) (quoting *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973)); *see also, e.g.*, *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009) (agency action "was not arbitrary or capricious" because agency "articulated rational reasons related to its statutory responsibility"). As noted, the INA grants general regulatory authority to DHS to, among other things, set the time and conditions for the lawful continued admission of each nonimmigrant class. 8 U.S.C. §§ 1103(a)(1)-(3), 1184(a)(1). Thus, in *Narenji v. Civiletti*, "[r]ecognizing the broad authority conferred upon" DHS by sections 1184(a) and 1103(a), we held that the INA "need not specifically authorize each and every action taken by [DHS], so long as [its] action is reasonably related to the duties imposed upon [it]." 617 F.2d 745, 747 (D.C. Cir. 1979). We recognize that same constraint here. Pursuant to the Secretary's obligation to exercise its rulemaking power in keeping with the statute's text and structure, DHS must ensure that the times and conditions it attaches to the admission of F-1 students are reasonably related to the purpose for which they were permitted to enter.

The 2016 Rule is reasonably related to the nature and purpose of the F-1 visa class: pursuing a full course of study at an established academic institution. The 2016 Rule explains in detail DHS's educational rationale for authorizing practical training for F-1 students. Many students, especially those in the fields of science, technology, engineering, and mathematics, can succeed at classroom training but need practical training in a workplace setting to operationalize their

new knowledge. In computer science, for example, practical opportunities to work with colleagues and managers supplied with the requisite hardware and software and adept with skills to deploy what a recent graduate learned only in the classroom may be critical to the graduate's ability to transfer the value of the classroom education to a workplace in their home country.

DHS notes, for example, that the Optional Practical Training program "enriches and augments a student's educational experience by providing the ability for students to apply in professional settings the theoretical principles they learned in academic settings." 81 Fed. Reg. 13,040, 13,051 (Mar. 11, 2016); *see also id.* at 13,041-43, 13,049, 13,051. Hundreds of students and academic institutions confirmed that view during the rulemaking, observing, for example, that "OPT allows students to take what they have learned in the classroom and apply 'real world' experience to enhance learning and creativity while helping fuel the innovation that occurs both on and off campus," that "[l]earning through experience is distinct from learning that takes place in the classroom," and that "[e]xperential learning opportunities have become an integral part of U.S. higher education." *Id.* at 13,050. The Department agreed, explaining that "practical training is an accepted and important part" of F-1 students' education. *Id.*

With respect to the STEM extension specifically, DHS further explained that the duration of the extension "is based on the complexity and typical duration of research, development, testing, and other projects commonly undertaken in STEM fields." *Id.* at 13,088. Notably, the Department rejected the suggestion that it allow practical training unrelated to the F-1 student's field of study, instead imposing a requirement of a "nexus" with the academic concentration in order to "minimize[] potential abuse or exploitation." *Id.* at 13,051. The Department also observed that work authorization without

such a nexus would be inconsistent with the purposes of Optional Practical Training, which is, "at its core, . . . a continuation of the student's program of study." *Id.* Washtech does not challenge any of those observations or conclusions.

The 2016 OPT Rule's design closely ties it to the purposes of the F-1 visa class. Before an F-1 student can even apply for OPT, an administrator at the student's academic institution must recommend the student for it. 8 C.F.R. § 214.2(f)(10)(ii)(C)(3), (f)(11)(i); *id.* § 214.3(*l*)(1). Once recommended, an OPT applicant can only seek practical training via employment that is "directly related to the student's major area of study." *Id.* § 214.2(f)(10)(ii)(A); *see id.* § 214.2(f)(10)(ii)(C)(4) (STEM OPT extensions must be "directly related to the degree that qualifies the student for [the] extension"). STEM OPT students and their potential employers must submit to the institutional recommender a "training plan" that "identif[ies] goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explain[s] how those goals will be achieved through the work-based learning opportunity with the employer; describe[s] a performance evaluation process; and describe[s] methods of oversight and supervision." *Id.* § 214.2(f)(10)(ii)(C)(7). The recommender must then submit that training plan to DHS. *Id.* § 214.2(f)(10)(ii)(C)(9)(iii). Then, while the practical training is ongoing, participants and their employers must report back to the institutional recommender—who in turn reports to DHS—on participants' educational progress. *Id.* § 214.2(f)(10)(ii)(C)(9)(i)-(iii). At every stage of the program, OPT and its STEM extension are confined to professional opportunities that enhance the value and practical effectiveness of the classroom study for which all F-1 nonimmigrants come in the first place.

The INA constrains the Department to set only such times and conditions for F-1 students' admission as are reasonably related to their visa class. OPT falls within those limits. The program is thus a valid exercise of DHS's statutory authority.

**2.**

Before turning to the other bases Washtech urges for invalidating the OPT Rule, we review the powerful historical evidence that Congress meant to do what section 1184(a)(1)'s text says: to grant the Executive power to allow nonimmigrants who come to the United States for higher education to engage in limited periods of practical training as an educational complement to their classroom studies.

Congressional ratification of post-graduation practical training periods dates back over 70 years. Congress enacted the Immigration and Nationality Act in 1952 using terms and phrases it knew were present in the predecessor legislation, and that it also knew had been relied on by the Executive at least as early as 1947 to permit foreign students to engage in practical training following their regular course of study. Just as enactment of "a statute that had in fact been given a consistent judicial interpretation . . . generally includes the settled judicial interpretation," *Pierce v. Underwood*, 487 U.S. 552, 567 (1988), "repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative . . . interpretations as well," *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). "If a statute uses words or phrases that have already received authoritative construction by . . . a responsible administrative agency, they are to be understood according to that construction." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322 (2012).

It is unusually clear that Congress was aware of the prior practice of authorizing foreign students' practical training. When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). That presumption is "particularly appropriate" when "Congress exhibited both a detailed knowledge of the [relevant] provisions" and interpretations of those provisions when it adopted the new law. *Id.* But there is no need for presumptions here, given that Congress readied itself to enact the INA in 1952 by directing the Senate Judiciary Committee to conduct "a full and complete investigation of our entire immigration system," S. Rep. No. 81-1515, at 1 (1950). The resulting study disclosed the same kind of program as an exercise of the same statutory power at issue here. The Senate Judiciary Committee's "two-year study" was the "genesis" of the Immigration and Nationality Act, overhauling the 1924 statutory regime and providing the foundation for U.S. immigration law that persists today. 1 CHARLES GORDON ET AL., IMMIGRATION LAW & PROCEDURE § 2.03[1] (2019).

Five years before Congress enacted the 1952 INA, the Immigration and Naturalization Service had promulgated a regulation governing visiting students which provided that "[i]n cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month periods." 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947). The 1950 Senate Report specifically recognized that, "since the issuance of the revised regulations in August 1947 . . . practical training has been authorized for 6 months *after completion of the student's regular course of study*." S. Rep. No. 81-1515, at 503 (1950) (emphasis added).

With full knowledge that the Executive was permitting post-graduation practical training for visiting students under the time-and-conditions authority conferred on it by the 1924 statute, and "[a]gainst [that] background understanding in the . . . regulatory system," Congress in 1952 "made a considered judgment to retain the relevant statutory text." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015). The 1952 INA, like the 1924 Immigration Act, authorized the Executive to admit nonimmigrants "for such time" and "under such conditions" as it set by regulation. *Compare* Immigration Act of 1924, Pub. L. No. 68-139, § 15, 43 Stat. 153, 162-63, *with* Immigration and Nationality Act, Pub. L. No. 82-414, § 214(a), 66 Stat. 163, 189 (1952). And the F-1 student visa defined by the 1952 INA, like the analogous permission under the 1924 Act, rendered eligible "a bona fide student" seeking to enter "solely for the purpose of . . . study at an" academic institution. *Compare* Pub. L. No. 68-139, § 4(e), 43 Stat. 153, 155, *with* Pub. L. No. 82-414, § 101(15)(F), 66 Stat. 163, 168. *See Review of Immigration Problems: Hearings Before the Subcomm. on Immigr., Citizenship, and Int'l Law of the H. Comm. on the Judiciary*, 94th Cong. 24 (1975) ("Chapman Testimony") (statement of Hon. Leonard F. Chapman, Jr., Comm'r, INS) (noting that F-1 "is a provision that has really been in effect under earlier law for about 50 years, starting in 1924"). This is "convincing support for the conclusion that Congress accepted and ratified" the INS's interpretation and implementation of that reenacted text. *Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 536.

In sum, evidence reaching back several generations shows "that Congress intended to ratify" the Executive's interpretation "when it reiterated the same definition[s] in" the INA that it had used in the 1924 Act. *Bragdon*, 524 U.S. at 645.

**3.**

More than seventy years of history and practice since it enacted the 1952 INA shows that Congress has not changed its mind. If Congress has continually declined to disturb a longstanding interpretation of a statute, that "may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation"—particularly "if evidence exists of the Congress's awareness of and familiarity with such an interpretation." *Jackson v. Modly*, 949 F.3d 763, 772-73 (D.C. Cir. 2020) (formatting modified) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979)); *see Bob Jones Univ. v. United States*, 461 U.S. 574, 599-602 (1983); *cf. Abourezk v. Reagan*, 785 F.2d 1043, 1055-56 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). And indeed, Congress is well aware that, time and again, immigration authorities under multiple administrations of both major parties reaffirmed a practical training component available to F-1 students under executive branch rules pursuant to the Executive's time-and-conditions powers.

In this case, evidence of congressional acquiescence abounds. The INS under the Nixon administration, for instance, reauthorized the practical training regime for training recommended by the student's school following completion of coursework, and increased the training period from 6 to 18 months. *See* 34 Fed. Reg. 18,085, 18,085 (Nov. 8, 1969); 38 Fed. Reg. 32,425, 34,426 (Dec. 28, 1973). During the Carter administration, the INS continued practical training programs, again explicitly describing their availability "[a]fter completion of a course or courses of study." 42 Fed. Reg. 26,411, 26,413 (May 24, 1977). The Reagan administration did the same, clarifying that post-graduation practical training was not limited to particular degree programs. 48 Fed. Reg. 14,575, 14,581, 14,586 (Apr. 5, 1983). When it reorganized

the practical training system for F-1 students, the administration of George H.W. Bush coined the term "Optional practical training" in describing temporary, on-the-job educational opportunities. 57 Fed. Reg. 31,954, 31,956 (July 20, 1992). And, in the 2016 Rule Washtech challenges here, DHS in the Obama administration extended the maximum post-coursework practical training period for F-1 students in STEM fields. 81 Fed. Reg. 13,040 (Mar. 11, 2016).

That longstanding practice was no secret to Congress. Witnesses at congressional hearings across the decades spoke directly of F-1 students staying in the country for temporary periods of practical training. In 1975, for example, the INS Commissioner told Congress that, while "[t]here is no express provision in the law for an F-l student to engage in employment," the INS had "[n]evertheless, for many years . . . permitted students to accept employment under special conditions." Chapman Testimony at 26. That permission included "employment for practical training," which could "be engaged in full time" for "increments of 6 months, not to exceed 18 months." *Id.* at 23. In the Commissioner's view, that program was entirely "consistent with the intent of the statute" to ensure that a student "come[s] here solely to pursue his education" rather than "with the expectation and intention of working." *Id.* at 21. Similarly, 1989 testimony publicly reminded Congress that F-1 visa-holders were being "appropriately given the opportunity to engage in a brief period of practical training upon completion of their university education and in furtherance of their educational goals." *Immigration Reform: Hearing Before the Subcomm. on Immigr. and Refugee Affs. of the S. Comm. on the Judiciary on S. 358 and S. 448*, 101st Cong. 485-486 (1989) (statement of Frank Kittredge, Pres., Nat'l Foreign Trade Council). And decisions by the Board of Immigration Appeals throughout this period also confirm the existence of post-graduation practical

training.  *See, e.g.*, *Matter of Lee*, 18 I. & N. Dec. 96, 96 (BIA 1981); *Matter of Kalia*, 14 I. & N. Dec. 559, 559 (BIA 1974); *Matter of Wang*, 11 I. & N. Dec. 282, 283 (BIA 1965); *Matter of Alberga*, 10 I. & N. Dec. 764, 764-65 (BIA 1964).

Washtech argues that prior practical training programs have not always been identical to the 2016 Rule at issue here. But the variations are immaterial.  What matters is that multiple presidential administrations for over 70 years have read section 1184(a)(1) to empower the Executive to authorize F-1 students to remain in the United States for post-graduation practical training overseen by their schools.  And Congress is well aware of that shared understanding and the continuous executive practice in conformity with it, yet has never disturbed the Department's determination that it has authority to allow post-graduation practical training for F-1 visa-holders.

This is not a case of longstanding provisions persisting unnoticed in some statutory backwater.  Congress regularly amends the INA.  And it has several times amended provisions bearing specifically on F-1 visas and nonimmigrant work rules. *See*, *e.g.*, Pub. L. No. 87-256, § 109(a), 75 Stat. 527, 534 (1961) (allowing noncitizen spouse and minor children to accompany F-1 visa-holder); Pub. L. No. 99-603, § 101, 100 Stat. 3359, 3360-74 (1986) (requiring specific employment authorization for nonimmigrant workers); Pub. L. No. 101-649, § 221(a), 104 Stat. 4978, 5027-28 (1990) (adding temporary pilot program for off-campus employment unrelated to F-1 visa-holder's field of study); Pub. L. No. 104-208, §§ 625, 641, 110 Stat. 3009, 3009-699-700, 3009-704-07 (1996) (adding limitations related to F-1 nonimmigrants at public schools); Pub. L. No. 107-173, §§ 501-502, 116 Stat. 543, 560-63 (2002) (adding monitoring requirements for foreign students); Pub. L. No. 111-306, 124 Stat. 3280, 3280-81 (2010) (requiring accreditation for language training programs).

Congress's repeated amendments of INA provisions regarding foreign students and nonimmigrant work opportunities evidence its approval of the practical training programs it left undisturbed. The Supreme Court has underscored that, "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974)). We recently reemphasized that the interpretive value of congressional acquiescence is strengthened where "Congress has amended various parts" of a statutory regime, "including the specific provision at issue" in the case at hand, "but has never sought to override" the relevant interpretation. *Modly*, 949 F.3d at 773.

Washtech raises just two arguments against the weight of all this history. First, it points to the wording of the 1947 practical training rule in place when Congress enacted the 1952 INA. Washtech contends that the rule's reference to practical training as "required" by the academic institution means it "must have taken place before graduation," so shows no congressional approval of post-coursework practical training. Appellant Br. at 37. But that slender reed bears no weight. The 1947 rule supported practical training "required *or recommended*" by the school, 12 Fed. Reg. 5,355, 5,357 (Aug. 7, 1947) (emphasis added), undercutting the point on its own terms. And, again, the Senate Committee itself, based on its investigation of the operation of the 1947 rule soon after it was promulgated, expressly reported to the Congress that the rule authorized practical training "after completion of the student's regular course of study." S. Rep. No. 81-1515, at 503 (1950).

Washtech's second effort to rebut the weight of history draws on three isolated statements in congressional reports that, in its view, reveal Congress's actual intent to disallow post-graduation practical training. Those statements establish no such thing. First, a 1952 House Report noted that foreign students "are not permitted to stay beyond the completion of their studies." H.R. Rep. No. 82-1365, at 40 (1952). But the point there had nothing to do with post-coursework practical training; rather, it explained that, because of the temporary nature of their stay, foreign students were identified in the bill as "nonimmigrants," *i.e.*, persons intending to return home, rather than "non-quota immigrants" as they had been in past legislation, which erroneously implied they intended to resettle here permanently. *Id.*; *see* Immigration Act of 1924, Pub. L. No. 68-139, § 15, 43 Stat. 153, 162-63 (referring to foreign students as "non-quota immigrant[s]").

Second, Washtech pulls out of context a reference in a Senate Judiciary Committee Report preceding the 1982 INA amendments. That report noted the amendments would "specifically limit [the F-1 provision] to academic students," S. Rep. No. 96-859, at 7 (1980), which Washtech says shows Congress's intention to confine F-1 students to academic, as distinct from practical, forms of education. In fact, the report distinguished "academic" students admitted under F-1 from "nonacademic or vocational students" for whom Congress had "create[d] a new nonimmigrant category, subparagraph (M)," which "provide[d] for their entry according to the same terms and conditions as those set forth for (F) academic students." *Id.* The Report has no bearing on the lawfulness of the OPT program.

Lastly, Washtech highlights a House Report accompanying the Immigration Act of 1990, which noted that, "to assure compliance with the student visa," the Act would

require visiting students "to be in good academic standing," H.R. Rep. No. 101-723, at 66 (1990). Washtech claims the report "directly contradicts" allowing F-1 students "employment outside of a course of study." Appellant Br. at 32. The report's reference to good academic standing sought to ensure that the program not be "administered as a temporary worker program" under which workers might seek to enter as F-1 students without the requisite purpose to complete coursework. H.R. Rep. No. 101-723, at 67 (1990). But that comports with Congress's approval of OPT. The government agrees that OPT participants must fulfill academic requirements as well as obtain their school's recommendation of OPT. Indeed, the very passage Washtech quotes in the House Report also identifies a "concern[]" that those OPT participants "do not have adequate labor protections" in their practical training jobs. *Id.* at 66. Consistent with the terms and intent of the entire OPT program to authorize employment as practical training opportunities for foreign students without displacing U.S. workers, Congress sought to ensure "payment of prevailing wages" to F-1 students so they would not undercut wages to which U.S. employees are entitled. *Id.*

The statements Washtech identifies do nothing to call into question the robust legislative and administrative practice showing Congress's longstanding awareness and repeated embrace of post-coursework practical training for qualifying F-1 students.

**4.**

The centerpiece of Washtech's challenge is the F-1 provision, which it interprets to preclude reliance on section 1184(a)(1) as support for the 2016 Rule. Washtech misreads F-1 to exhaustively delineate rather than inform and constrain

the authority Congress separately conferred on the Executive to set the time and conditions of nonimmigrants' admission.

The F-1 provision appears in the "Definitions" section of the INA. *See* 8 U.S.C. § 1101. Its primary function is to establish one of several dozen categories of foreign nationals who may be eligible for a nonimmigrant visa: The applicant for an F-1 visa must be a "bona fide student" who is "qualified to pursue a full course of study," and she must be "seek[ing] to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at a U.S. academic institution. *Id.* § 1101(a)(15)(F)(i).

Washtech's central argument is that F-1 goes beyond identifying who may enter for what purposes; in its view, F-1 also imposes a bright-line graduation-day limit on the Secretary's authority to set nonimmigrants' terms of stay. Washtech argues that, because F-1 describes "a bona fide student . . . temporarily and *solely . . . pursuing . . . a course of study . . . at an established . . . academic institution*," *id.* (emphasis added), the Secretary lacks authority under section 1184(a)(1) to allow F-1 students to remain in the United States for any period after they have graduated. That is to say, according to Washtech, post-graduation practical training exceeds the Department's statutory time-and-conditions authority as constricted by the F-1 provision.

But Washtech overreads F-1's text, prompted in large part by its misapprehension of the relationship between F-1 and section 1184(a)(1).

Start with the text. The F-1 provision itself shows that the student-visa entry criteria are not terms of stay. Again, take for example the F-1 criterion that the person "seeks to enter the United States . . . ." 8 U.S.C. § 1101(a)(15)(F)(i). Washtech's reading, which treats any failure to continually meet the F-1

definition as grounds for deportation, nonsensically would require an admitted F-1 student to continue throughout her stay to seek to enter the country. It is also awkward at best to read F-1 to require students to be continually "qualified to pursue a full course of study" once they have already been admitted and enrolled, let alone after they have already completed any significant portion of that course of study. *Id.* These "implausible" and "counterintuitive" readings illustrate the error in Washtech's view of the F-1 provision and its role in the statutory scheme. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021); *see also, e.g.*, *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1060 (2019). Correctly understood, the F-1 provision sets threshold criteria for entry; it does not spell out the ongoing terms of stay.

Washtech itself acknowledges that the F-1 criteria it highlights as continuous requirements are not invariable constraints on the government's section 1184(a)(1) power to regulate the terms of stay. Despite its claim that F-1 prevents students in that visa class from staying in the country beyond graduation, for example, Washtech recognizes the Department's "discretion" to adopt a rule that permits F-1 students to remain at least for 60 days past graduation, since students "can't leave the next day and instantly be gone." Oral Arg. Tr. at 16; *see* 8 C.F.R. § 214.2(f)(5)(iv). *But see* Diss. Op. 5 n.3. More generally, Washtech does not challenge the stretches of time DHS allows F-1 students to remain in the country between school terms or between degree programs, *see* 8 C.F.R. § 214.2(f)(5)(ii)-(iii), even though students are not "pursu[ing] a full course of study" at an "academic institution" during those periods, *see* 8 U.S.C. § 1101(a)(15)(F)(i).

To some extent, then, Washtech acknowledges the Department's authority to allow students to remain here at times that do not strictly meet the F-1 provision's entry criteria.

In so doing, it implicitly accepts that F-1 works together with section 1184(a)(1) to empower the Executive to design workable and meaningful educational programs for nonimmigrant foreign students. Washtech points to no statutory support for its distinction between the Rule's allowance for practical training after graduation, which it challenges, and the exercises of section 1184(a)(1) time-and-conditions authority that Washtech approves—even though the latter, too, would contravene F-1 if the provision were treated as specifying the outer limit of the Secretary's regulatory authority over nonimmigrants' terms of stay.

By seizing on graduation day as the bright-line limit, Washtech both misapprehends the primary function of F-1 and fails to grapple with the critical role of the Executive's time-and-conditions power under section 1184(a)(1). Congress's decision in F-1 to admit foreign students "solely for the purpose of pursuing" a "full course of study" at an academic institution was not to impose an end-of-coursework time limit on F-1 nonimmigrants' admission, but to prevent entry into the country for the wrong reasons or under false pretenses. "By including restrictions on intent in the definition of some nonimmigrant classes, Congress must have meant aliens to be barred from these classes if their real purpose in coming to the United States was to immigrate permanently." *Elkins v. Moreno*, 435 U.S. 647, 665 (1978); *see* S. Rep. No. 81-1515, at 503 (1950) (emphasizing, in the Senate report on which the INA was based, that despite delays in approving foreign students' applications for work authorization, including for practical training, the INS should remain involved to "prevent people from coming in as students when their real intention is to reside and work here").

By design, both the longstanding practical-training regime and its iteration in the 2016 Rule challenged here comport with

the F-1 provision's purpose requirement. The mere availability of OPT to students for whom it is ultimately recommended does not render foreign students ineligible to enter the United States "solely for the purpose of pursuing" study at an academic institution. Nor does a decision to participate in practical training render foreign students retroactively ineligible to have entered solely for that purpose. Training through real-world employment overseen by one's academic institution has undisputed educational benefits. *Supra* at 14, 25-26. The 2016 Rule's programmatic requirements link employment for practical training with the student's coursework at, and recommendation from, their sponsoring academic institution, and they demand ongoing oversight by that institution as well as the employer and DHS. *Supra* at 14-15, 25-27. Congress understood that it does not detract from the accuracy or sincerity of F-1 students' purpose to come to this country "solely" to undertake a degree program that they may, once here, participate in practical training recommended, approved, and overseen by their school to augment the educational value of that degree. That holds true whether the student undertakes practical training as a limited period of full-time employment after completion of coursework, or on a part-time basis during the academic term. *See* 8 C.F.R. § 214.2(f)(10)(ii)(A)(2), (3).

Washtech's insistence that practical training conflicts with the terms of entry under F-1 is exceedingly formalistic. If the statute did make graduation the temporal outer bound, colleges and universities aware of the powerful educational advantages of practical training could presumably design programs for foreign students that included additional time to follow their coursework with a year (or up to three years for STEM students) of full-time practical training before they graduated. Indeed, the Rule itself allows schools to postpone foreign students' graduation until the completion of practical training,

specifying that "[c]ontinued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for [O]ptional [P]ractical [T]raining." *Id.* § 214.2(f)(10)(ii)(A)(3). The Rule reflects how closely OPT aligns with familiar educational models—such as undergraduate "co-op" programs, externships, work in STEM research laboratories, and medical internships—that incorporate practical training upon completion of related coursework, whether before or after students receive their degrees. And, importantly, for many decades and currently, schools are directly involved in recommending and overseeing practical training whether or not it occurs after graduation.

Washtech's statutory theory would seem to approve practical training on the employment-before-graduation model even as Washtech asserts lack of authority for post-graduation practical training overseen by the same schools for the same purposes. But the existing practical training regime and an employment-before-graduation replacement structure are almost identical: OPT participants pursue employment in their fields to "improve[] their ability to absorb a full range of project-based skills and knowledge directly related to their study." 81 Fed. Reg. 13,040, 13,049 (Mar. 11, 2016). And, just as they would for a pre-graduation, post-coursework OPT stint, school administrators—the Designated School Officials—screen post-graduation work opportunities for their educational value and monitor the specific work-based experience to ensure that it enriches the participant's course of study. *See* 8 C.F.R. § 214.2(f)(11); *supra* at 14-15. The only distinction between the hypothetical program and the challenged one is its timing relative to graduation. But the F-1 provision makes no mention of "graduation" as the bright-line outer bound for an F-1 student's stay. And there is no evidence Congress intended the Executive's authority under section

1184(a)(1) and F-1 to turn on such formalities in enrollment structure. Indeed, all the relevant evidence suggests that Congress has understood and approved of post-graduation practical training for over seventy years.

Washtech's only other argument from the text of F-1 is that the provision's instruction to schools to inform the government if nonimmigrant students stop attending "requires the alien's course of study to take place at an academic institution" that can be in a position to make such a report. Appellant Br. at 19-20. The phrase on which Washtech relies states that an F-1 student's approved academic institution "shall have agreed to report to the [Department] the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn." 8 U.S.C. § 1101(a)(15)(F)(i). According to Washtech, that text "presupposes" that the academic institution will have "an ongoing relationship" with the F-1 student "after admission," and therefore precludes F-1 students from remaining in the United States for post-graduation practical training. Appellant Br. at 19-20.

The most obvious shortcoming of that argument is that the 2016 Rule *does* require an ongoing relationship between the academic institution and the F-1 student. As described above, a school administrator oversees both the F-1 students' academic studies and every stage of their practical training. *See supra* at 14-15, 27. In any event, as the district court noted, the reporting requirement applies to schools, not F-1 students; the consequence of a school's failure to communicate with DHS regarding its F-1 students' activities is that the school may lose its status as an approved participant, not necessarily that the student must leave the country. *Washtech VI*, 518 F. Supp. 3d at 467-68. Students who remain after graduation pursuant

to DHS rules are not subject to immediate removal except under the flawed inference Washtech draws from the reporting requirements, bolstered by its misreading of the F-1 provision as stating criteria for the duration of an admitted F-1 student's stay.

Washtech's repeated reliance on the second clause of section 1184(a)(1) is misplaced for similar reasons. That clause authorizes the Executive in its discretion to require nonimmigrants to post bonds to ensure their timely departure: Congress told the Executive that its regulations "may . . . prescribe . . . the giving of a bond" as an additional enforcement tool "to insure that at the expiration of such time" as the nonimmigrant is authorized to remain in the United States, "or upon failure to maintain the status under which he was admitted," the nonimmigrant "will depart from the United States." 8 U.S.C. § 1184(a)(1). The 2016 Rule does not include a bond requirement, *see* 8 C.F.R. § 214.2(f)(10)(ii)(A)(3), nor does Washtech argue that it must. Its point is simply that the provision highlights the Executive's duty—with or without the aid of a bond—to "insure that" F-1 students "will depart from the United States" at the "expiration" of their authorized "time," or when they "fail[] to maintain the status under which [they were] admitted." The 2016 Rule's allowance for post-coursework practical training, says Washtech, violates that duty. But, as the district court explained, "Washtech's argument assumes the conclusion" that a period of post-graduation practical training is not within the permissible duration or status for F-1 students. *Washtech VI*, 518 F. Supp. 3d. at 468. "Washtech cannot answer a question about the proper scope of the F-1 visa category by pointing to an obligation to enforce that scope, whatever it may be." *Id.* For the reasons explained above, that conclusion is belied by the text of both section 1184(a)(1) and the F-1 provision, as well as their long history of interpretation by the executive and

legislative branches, all of which confirm the Department's authority to act within reason to set the duration of F-1 students' authorized stay.

In sum, we reject Washtech's reading of the purpose and dropout-reporting language in the F-1 provision and of section 1184(a)(1)'s bond clause as establishing that foreign students who enter lawfully on F-1 visas may not be allowed to remain in the United States for Optional Practical Training after completion of their coursework. That reading misreads the text, produces unworkable and arbitrary results, and contravenes the demonstrated intent of Congress.

**5.**

Washtech's final argument is a floodgates warning: If we do not read the definitions of visa types in 8 U.S.C. § 1101(a)(15)(A)-(V) as specifying continuous terms of stay on nonimmigrants, then DHS's authority is effectively boundless. The Department could "regulate out of existence all differences among non-immigrant visas—other than what the alien has to show at the time of admission," such as by allowing tourist visa-holders to stay and work in the country. Appellant Br. at 21. Likewise, there would be "no limit to the amount of time DHS can permit any non-immigrant to remain in the United States." *Id.* at 27. Specifically, if the F-1 provision does not require DHS to treat F-1 students as unauthorized to remain in the country once they graduate, then the Department could "allow them to abandon" their purpose of studying at an academic institution "immediately after [their] entry" into the United States and stay here indefinitely. *Id.* at 20.

The INA's structure and basic principles of administrative law constrain DHS's regulatory authority and prevent Washtech's predicted flood. As noted above, *supra* at 25-27,

the exercise of the time-and-conditions authority must "reasonably relate[]" to the distinct composition and purpose of the subject nonimmigrant class. *Doe, 1*, 920 F.3d at 871; *Narenji*, 617 F.2d at 747. That limiting principle is built into the relationship between the Department's section 1184(a)(1) time-and-conditions authority and the visa class definitions, including F-1. Section 1184(a)(1) applies to "admission to the United States of any alien as a nonimmigrant," and the INA defines "nonimmigrant" class-by-class rather than in gross.

As explained in the prior section, the time and conditions DHS sets are not cabined to the terms of the entry definition, even as the cross-reference in section 1184(a)(1) links the two provisions. The F-1 provision at issue here defines the purposes of that student visa class, and accordingly provides the touchstone for assessing the validity of the Department's exercise of its time-and-conditions authority over this class of nonimmigrants. Time-and-conditions rules must be reasonably related to the purpose of the nonimmigrant visa class. That requisite relationship rebuts Washtech's floodgates concern and makes clear that DHS has no "plenary authority" to allow F-1 visa-holders to stay indefinitely. Diss. Op. 10, 15. It likewise prevents the Department from, to take Washtech's example, granting indefinite work authorization as a condition of a B-2 tourist's admission, the purpose of which is to enter the country "temporarily for pleasure." 8 U.S.C. § 1101(a)(15)(B). Admitting a nonimmigrant tourist is different from admitting a nonimmigrant student, business traveler, diplomat, agricultural worker, performer, or crime witness, *see* 8 U.S.C. § 1101(a)(15)(A), (B), (F)(i), (H)(ii), (P)(ii), (S), and the authority to set times and conditions on those distinct admissions differs accordingly.

For the reasons discussed at length above, the 2016 Rule is reasonably related to the nature and purpose of the F-1 visa

class. *See supra* at 25-28. DHS designed the 2016 Rule to advance the core purpose of admission for the F-1 visa class: pursuing a full course of study at an established academic institution. And the Rule imposes strict requirements to ensure a "direct relat[ionship]" between the F-1 student's practical training and his or her coursework. 8 C.F.R. § 214.2(f)(10)(ii)(A); *see id.* § 214.2(f)(10)(ii)(C)(7); *supra* at 26-27. The OPT program is therefore a valid exercise of the Secretary's statutory authority.

### III. OPT's Work Authorization

Washtech further claims that OPT is unlawful because DHS lacks the authority to provide any work authorization at all. Appellant Br. at 27-32. That claim fails, too. The Department's charge to set the "conditions" of nonimmigrant admission includes power to authorize employment—a fact that Congress has expressly recognized by statute. The Immigration Control and Reform Act (IRCA) defines non-nationals authorized to work as persons so authorized "either" by the statute "or by the Attorney General." 8 U.S.C. § 1324a(h)(3). IRCA thereby acknowledges the Executive's prerogative, where otherwise appropriate, to use powers that do not expressly mention non-nationals' work to grant work authorization.

### A.

In its arguments regarding work authorization, Washtech again ignores the INA's explicit grant of authority to the Department. The statute commands DHS to "establish such regulations" as its Secretary "deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(3). And it specifically provides that the "admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations

prescribe." *Id.* § 1184(a)(1). Here, the operative term is "conditions," which grants DHS authority to determine the circumstances of a nonimmigrant's stay in the United States. *See Condition*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 473 (2002) ("*pl*: attendant circumstances"). The Department exercises that authority over F-1 visa-holders in many ways. For instance, DHS regulations determine where they can study, 8 C.F.R. § 214.2(f)(6), how many courses they must take, *id.*, what any accompanying spouse or children may do while in the country, *id.* § 214.2(f)(15), and when visa-holders can take temporary absences from the United States and re-enter on the same visa, *id.* § 214.2(f)(4). Whether they can work is no different; Washtech provides no basis to conclude that employment opportunities are excluded from the Department's comprehensive control over nonimmigrant students' time in the United States. *See* 8 U.S.C. § 1184(a)(1).

History corroborates that Congress meant what it plainly said in the INA when it granted DHS authority in section 1184(a)(1) to set the conditions of F-1 students' admission. Washtech does not contest, for instance, that DHS and its predecessors have been authorizing student visa-holders to work at jobs related to their studies since at least 1947. *See* 12 Fed. Reg. 5,355, 5,355-57 (Aug. 7, 1947). And across decades of the Executive doing so openly, we have explained, Congress has chosen to maintain the relevant provisions of the F-1 student category when it enacted the INA in 1952 and made many ensuing amendments—all of which preserved both the F-1 category and the section 1184(a)(1) authority under which the Executive had long granted work authorizations. *See, e.g.*, *Proposed Rules for Employment Authorization for Certain Aliens*, 44 Fed. Reg. 43,480, 43,480 (July 25, 1979) ("authority to grant employment authorization").

Indeed, when amending the INA in 1986 to create its employment authorization regime, Congress appears to have borrowed key terminology and concepts from earlier Department regulations—regulations that both expressly declared DHS's power to grant work authorization and granted it to certain nonimmigrant classes. *See* Br. of American Immigration Council at 7-15. Even earlier, in 1961, Congress also expressly exempted F-1 students from several forms of wage taxes—a measure that would be completely unnecessary if those students lacked authorization to work. 26 U.S.C. §§ 3121(b)(19), 3306(c)(19); 42 U.S.C. § 410(a)(19); *see* Pub. L. No. 87-256, § 110, 75 Stat. 527, 536-37 (1961). In other words, "Congress has not just kept its silence by refusing to overturn [an] administrative construction, but has ratified it with positive legislation." *Schor*, 478 U.S. at 846 (quoting *Red Lion Broad. Co., Inc. v. FCC*, 395 U.S. 367, 381-82 (1969)). We "cannot but deem that construction virtually conclusive." *Id.*

### B.

The 1986 Immigration Control and Reform Act further confirms that DHS may lawfully authorize employment for nonimmigrants, including F-1 students. IRCA established a "comprehensive scheme" to govern the employment of foreign nationals in the United States. *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002). As relevant here, IRCA prohibits the employment of "unauthorized aliens." 8 U.S.C. § 1324a(a)(1). And it defines an "unauthorized" alien as one who is neither "lawfully admitted for permanent residence" nor "authorized to be so employed by this chapter or by the Attorney General"—now DHS. *Id.* § 1324a(h)(3).

IRCA's express recognition that aliens may be "authorized to be . . . employed . . . by" DHS confirms that Congress has

deliberately granted the Executive power to authorize employment. In denying a petition for rulemaking, the Reagan administration reaffirmed the position the Executive has maintained for decades:

> [T]he only logical way to interpret [Section 1324a] is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

*Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987); *see also* 1 CHARLES GORDON ET AL., IMMIGRATION LAW & PROCEDURE § 7.03[2][c] (2019) (reaching same conclusion).

Washtech asserts that section 1324a(h)(3) does not expressly confer any authority to DHS, Appellant Br. at 28-30, and that if it did, it would violate the nondelegation doctrine, *id.* at 30-31. Because section 1324a(h)(3) could not grant the power to issue work authorization, Washtech concludes, DHS must not have that power at all. Those arguments miss the mark. Washtech is right that section 1324a(h)(3) is not the source of the relevant regulatory authority; it just defines what it means for an alien to be "unauthorized" for employment. But that was never the government's point. What matters is that section 1324a(h)(3) expressly acknowledges that employment authorization need not be specifically conferred by statute; it can also be granted by regulation, as it has been in rules promulgated pursuant to DHS's statutory authority to set the "conditions" of nonimmigrants' admission to the United

States. The OPT Rule's authorization for F-1 students to work in jobs that provide practical training related to their course of study is just such a rule. Washtech's claim that the OPT Rule conflicts with the congressional prohibition against unauthorized aliens' employment therefore fails.

## IV. Any Remaining Ambiguity Counsels Deference

The most straightforward reading of the INA is that it authorizes DHS to apply to admitted F-1 students the additional "time" and "conditions" that enable them to remain here while participating in OPT recommended and overseen by their respective academic institutions. But at a minimum, even if it is ambiguous on the point, the statute may reasonably be understood as the Department has read it in support of the 2016 OPT Rule. That interpretation thus merits our deference. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). We readily conclude that OPT is "neither arbitrary or capricious in substance, nor manifestly contrary to the statute," and "thus warrant[s] the Court's approbation." *Astrue v. Capato ex rel. B.N.C.*, 566 U.S. 541, 558 (2012) (internal quotation marks omitted) (formatting modified). "[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted); *see also Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 56-67 (2014) (opinion of Kagan, J.); *Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021).

"[W]hen Congress grants an agency the authority to administer a statute by issuing regulations with the force of law, it presumes the agency will use that authority to resolve ambiguities in the statutory scheme." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016). Accordingly, Step

One of the *Chevron* test asks whether the statute is unambiguous in the relevant sense—that is, whether Congress has "directly addressed the precise question at issue." *Mayo Found. v. United States*, 562 U.S. 44, 52 (2011). Here, the question is whether DHS's time-and-conditions authority empowers the Department to permit F-1 students to stay in the United States for post-graduation practical training. If the statute is ambiguous on that point, we ask at Step Two whether the agency has made a "a reasonable choice within [the] gap left open by Congress." *Chevron*, 467 U.S. at 866.

Washtech claims that Congress has directly addressed the relevant question—specifically, that the F-1 provision's visa entry criteria impose continuous terms of stay, so preclude DHS from allowing F-1 students to remain in the country if they are not currently enrolled at an academic institution. But, as we have explained, the best reading of the F-1 provision is that it imposes threshold entry criteria; it does not itself spell out the ongoing conditions under which F-1 students may lawfully stay but rather constrains the exercise of time-and-conditions authority under Section 1184(a)(1). Even if alternative readings are available, making the statute materially ambiguous, it is at least reasonably susceptible of the Department's interpretation.

The Department's view of its F-1 and time-and-conditions authority as supportive of the 2016 Rule is wholly reasonable. Substantial and uncontested evidence in the record, together with other public analyses amici highlighted, demonstrates the educational value of practical training for OPT participants, especially in the STEM field. *See, e.g.*, 81 Fed. Reg. 13,040, 13,051, 13,088 (Mar. 11, 2016); J.A. 173-78 (Comment letter of 12 major university associations); *id.* 147-50 (Comment letter of NAFSA: Association of International Educators); Br. of Amicus Curiae Presidents' Alliance on Higher Education

and Immigration at 6-11.  And OPT's nexus to an F-1 student's course of study, together with the student's application to the school for approval and the school's reporting responsibilities to DHS, ensure that the additional time and practical training opportunities available through the program help F-1 students to cement the knowledge acquired in their coursework consistent with legal limits.  *See* 8 C.F.R. § 214.2(f)(10)-(11); 81 Fed. Reg. at 13,041-42, 13,090-98, 13,063, 13,068-69.  In short, DHS applied its expertise to conclude that OPT serves the purposes of the F-1 visa category and comports with the powers and limits of the INA.

As neither "experts in the field" nor "part of either political branch of the Government," we have a "duty to respect legitimate policy choices made by those who [are]." *Chevron*, 467 U.S. at 865-66.  We appreciate that Washtech strongly disagrees with those policy choices.  Nonetheless, "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones." *Id.* at 866.  The evidence and analysis on which DHS relied in promulgating the 2016 OPT Rule demonstrate the reasonableness of the Department's interpretation of its time-and-conditions authority, 8 U.S.C. § 1184(a)(1), in the context of the F-1 visa program, *id.* § 1101(a)(15)(F)(i).  That interpretation warrants "particular deference" where, as here, it takes the form of a "longstanding," *Barnhart v. Walton*, 535 U.S. 212, 220 (2002); *see NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 274-75 (1974), and widely known executive-branch program that Congress has left undisturbed, even as it has frequently revisited and amended the statutory scheme in other closely related respects, *Schor*, 478 U.S. at 845-46; *Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008); *see supra* at 28-36.  As a result, any ambiguity

in the scope of the time-and-conditions authority counsels deference to the Executive's interpretation.

## V.   Washtech's Motion to Strike

There is one final issue to resolve.  Washtech asserts that the district court erroneously denied its Motion to Strike the Brief Amici Curiae of Institutions of Higher Education in Support of Intervenors.  As the district court noted, it has broad discretion to allow amicus briefs when they provide "unique information or perspective" that "can help the [c]ourt beyond the help that the lawyers for the parties are able to provide." *Washtech VI*, 518 F. Supp. 3d at 453 n.2 (quoting *Hard Drive Prods. Inc. v. Does 1–1,495*, 892 F. Supp. 2d 334, 337 (D.D.C. 2012)).   Washtech asserts that the amicus brief contained information that would be "inadmissible under the federal rules of evidence" and that it "attempted to supplement the record." *See* Appellant Br. at 44-46.  But the district court relied on nothing outside the administrative record; it decided only the legal question whether OPT exceeded the Department's statutory authority and mentioned the brief only to acknowledge its existence when denying the motion to strike. *Washtech VI*, 518 F. Supp. 3d at 453 n.2.  Even if the disputed amicus brief were impermissible, it was not shown to be prejudicial in any way.  We therefore affirm the district court's valid exercise of its discretion to deny the motion to strike.

* * *

For the foregoing reasons, we affirm the district court decision denying Washtech's motion for summary judgment, granting the Department's and Intervenors' motions for summary judgment, and denying Washtech's motion to strike.

*So ordered*.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part:

Although I agree with my colleagues on standing, I part company on the merits. On appeal from the district court's grant of summary judgment for the Department of Homeland Security (DHS), the merits question is whether either 8 U.S.C. § 1101(a)(15)(F)(i) or 8 U.S.C. § 1324a(h)(3) authorizes the DHS to allow nonimmigrant "students" to work in the United States for up to three years past completion of their degree. Because the first statute, the F-1 statute, plainly does not delegate the asserted authority and the district court relied entirely on that provision to grant summary judgment to the government,[1] I would reverse and remand.

## I. BACKGROUND

### A. STATUTORY BACKGROUND

The Immigration and Nationality Act of 1952 (INA), Pub. L. No. 82-414, 66 Stat. 163, and its subsequent amendments define "classes of nonimmigrant aliens" for admission to the United States. *See* 8 U.S.C. § 1101(a)(15). The DHS administers the INA and is authorized to admit the specified classes of nonimmigrants and to prescribe regulations setting the duration and conditions of their admission. *See id.* § 1184(a)(1).[2] DHS regulations "insure that at the expiration of

---

[1] As discussed *infra* at 20–22, the district court did not address whether section 1324a(h)(3) provides independent statutory authority for the optional practical training (OPT) program.

[2] The statute refers to the Attorney General because the Immigration and Naturalization Service (INS) was within the Department of Justice and administered the INA before the DHS was created in 2002. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (citing 6 U.S.C. §§ 251(2), 252(a)(3), 271(b)). For ease of reference, I refer to the DHS as the responsible government agency. *See Wash.*

such [duration] or upon failure to maintain the status under which he was admitted, . . . such alien will depart from the United States." *Id.*

Colloquially, a nonimmigrant's class designates the type of visa he holds. An F-1 visa holder is thus a nonimmigrant admitted under the F-1 statute, 8 U.S.C. § 1101(a)(15)(F)(i). A number of provisions of the INA are at issue in this case but the primary provision is the F-1 statute, which describes an F-1 visa holder as follows:

> an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(l) of this title at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, particularly designated by him and approved by the [Secretary of Homeland Security] after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the [Secretary of Homeland Security] the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn.

---

*All. of Tech. Workers v. DHS* (*Washtech IV*), 892 F.3d 332, 337 n.1 (D.C. Cir. 2018).

8 U.S.C. § 1101(a)(15)(F)(i).

Another class of nonimmigrant is the H-1B visa holder. An H-1B visa is available for employment in a "specialty occupation," 8 U.S.C. § 1101(a)(15)(H), or in those occupations requiring "(A) theoretical and practical application of a body of specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States," *id.* § 1184(i)(1). To qualify for a specialty occupation, the nonimmigrant applicant must have received "full state licensure to practice in the occupation, if such licensure is required to practice"; have "complet[ed] . . . the degree described [above] for the occupation"; or have "experience in the specialty equivalent to the completion of such degree, and . . . recognition of expertise in the specialty through progressively responsible positions relating to the specialty." *Id.* § 1184(i)(2). Since the creation of the modern H-1B visa in 1990, *see* Immigration Act of 1990, Pub. L. No. 101-649, § 205(c), 104 Stat. 4978, 5020, the Congress has capped the total number of H-1B visas the DHS may issue each year. 8 U.S.C. § 1184(g)(1), (g)(5).

The final piece of the statutory puzzle is the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. 99-603, 100 Stat. 3359 (1986), in which the Congress made the "employment of unauthorized aliens unlawful," *id.* § 101, 100 Stat. 3360 (codified at 8 U.S.C. § 1324a(a)). More precisely, the IRCA makes it unlawful for an employer to "hire . . . for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3))." 8 U.S.C. § 1324a(a)(1)(A). The definitional provision, section 1324a(h)(3), states:

As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the [Secretary of Homeland Security].

8 U.S.C. § 1324a(h)(3).

### B. REGULATORY AND PROCEDURAL BACKGROUND

Because we have previously addressed much of the regulatory and procedural background during the long life of this litigation, *see Wash. All. of Tech. Workers v. DHS* (*Washtech IV*), 892 F.3d 332 (D.C. Cir. 2018), I confine this background to the relevant components only.

The INA authorizes the Secretary of Homeland Security to promulgate regulations "and perform such other acts as he deems necessary for carrying out his authority under the [INA]." 8 U.S.C. § 1103(a)(3). Relying on that authority and the other authorities outlined above, the DHS thrice—in 1992, 2008 and 2016—promulgated regulations extending the F-1 nonimmigrant visa to include a period of employment after the visa holder finishes his degree, which employment is termed post-completion "optional practical training" or OPT. *See, e.g.*, Pre-Completion Interval Training; F–1 Student Work Authorization, 57 Fed. Reg. 31,954, 31,955–56 (July 20, 1992) (1992 OPT Rule). To capture post-completion OPT, the DHS defines a nonimmigrant student's duration of F-1 status as "the time during which an F–1 student is pursuing a full course of study at an educational institution approved by the [agency] for attendance by foreign students, or engaging in authorized

practical training following completion of studies." 8 C.F.R. § 214.2(f)(5)(i).[3]

The 1992 OPT Rule allowed "[a]n F–1 student [to] apply . . . for authorization for temporary employment for [OPT] directly related to the student's major area of study" and authorized OPT to extend "[a]fter completion of all course requirements for the degree" or "after completion of the course of study." 57 Fed. Reg. at 31,956 (codified at 8 C.F.R. § 214.2(f)(10)(ii)(A) (1992)). The 1992 OPT Rule permitted up to twelve months of post-completion OPT. *Id.* (codified at 8 C.F.R. § 214.2(f)(11) (1992)).

In 2008, the DHS promulgated a regulation that allowed F-1 students with Science, Technology, Engineering and Mathematics (STEM) majors to apply for up to a seventeen-month extension of OPT. Extending Period of Optional Practical Training by 17 Months for F–1 Nonimmigrant Students with STEM Degrees and Expanding Cap-Gap Relief for All F–1 Students with Pending H–1B Petitions, 73 Fed. Reg. 18,944, 18,944–56 (Apr. 8, 2008) (2008 OPT Rule). After the Washington Alliance of Technology Workers (Washtech), a labor union representing STEM workers, successfully challenged the DHS's failure to undertake notice and comment before issuing the rule, the district court vacated the rule but stayed its vacatur until 2016 to allow the DHS to correct the

---

[3] Because foreign students are often admitted for "duration of status," they are not admitted until a specific date but instead until their status ends. 2 CHARLES GORDON ET AL., IMMIGRATION LAW & PROCEDURE § 18.03[7][b] (rev. ed. 2022). In the case of an F-1 student, the termination date is the day the "course of study" for which he was admitted ends. 8 U.S.C. § 1101(a)(15)(F)(i).

error. *Wash. All. of Tech. Workers v. DHS* (*Washtech I*), 156 F. Supp. 3d 123, 145–49 (D.D.C. 2015).[4]

In 2016, after undertaking notice and comment, the DHS issued the final rule now under attack. Improving and Expanding Training Opportunities for F–1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F–1 Students, 81 Fed. Reg. 13,040, 13,040–122 (Mar. 11, 2016) (2016 OPT Rule). The 2016 OPT Rule again extended the duration of permissible OPT—this time to twenty-four months for STEM students. When combined with the twelve-month extension promulgated in 1992, the 2016 OPT Rule thus permitted STEM F-1 students to remain and work in the U.S. for up to thirty-six months after receiving their degree. *Id.* at 13,087.

Shortly after the 2016 OPT Rule's promulgation, Washtech filed the instant complaint alleging, *inter alia*, that the DHS's issuances of the 1992 OPT Rule (Count I) and the 2016 OPT Rule (Count II) exceeded its statutory authority. The district court dismissed the complaint, reasoning that Washtech lacked standing as to Count I and that Washtech had "conceded" that it had failed to state a claim for relief by not responding to the DHS's arguments in opposition to Count II. *Wash. All. of Tech. Workers v. DHS* (*Washtech III*), 249 F. Supp. 3d 524, 536–37 (Count I), 555 (Count II) (D.D.C. 2017). Washtech appealed and we reversed in 2018. *Washtech IV*, 892 F.3d at 339. We affirmed the district court's dismissal of Count I on the alternative ground that the claim was untimely because

---

[4] I use *Washtech I* to remain consistent with the majority's numbering. The district court's earlier judgment in the case was vacated as moot and is not relevant to this appeal. *See Wash. All. of Tech. Workers v. DHS*, 74 F. Supp. 3d 247 (D.D.C. 2014), *judgment vacated, appeal dismissed*, 650 F. App'x 13 (D.C. Cir. 2016) (*Washtech II*).

the six-year window to challenge the rule had closed in 1998. *Id.* at 342. We noted, however, that "the dismissal of Count I does not foreclose Washtech's challenge to the statutory authority of the OPT program as a whole because the 2016 Rule may have reopened the issue anew." *Id.* We instructed the district court to consider on remand "whether the reopening doctrine applies to the issue raised in Count II." *Id.* at 339. On Count II, we reversed the district court's dismissal, concluding that Washtech had standing to challenge the 2016 OPT Rule based on increased competition faced by its members as a result of the rule. *Id.* at 341–42.

On remand, the district court held the DHS had reopened the statutory authority issue as to the entire OPT program because the DHS had "reconsidered its authority to implement the OPT Program" in the 2016 OPT Rule. *Wash. All. of Tech. Workers v. DHS* (*Washtech V*), 395 F. Supp. 3d 1, 14 (D.D.C. 2019). It also allowed three parties to intervene. *Id.* at 15–21.[5] The case proceeded to summary judgment solely on Count II of the complaint, which alleges that the "DHS policy of allowing aliens to remain in the United States after completion of the course of study to work or be unemployed is in excess of DHS authority." Compl. ¶ 63. In the order *sub judice*, the district court granted summary judgment to the DHS and the intervenors. *Wash. All. of Tech. Workers v. DHS* (*Washtech VI*), 518 F. Supp. 3d 448, 453 (D.D.C. 2021). Borrowing much of its reasoning from its vacated *Washtech I* opinion, the court applied the *Chevron* doctrine and determined that at *Chevron* step one, the F-1 statute is ambiguous because "Congress has not directly addressed the precise question at issue, namely, whether the scope of F-1 encompasses post-completion

---

[5] The intervenors are the National Association of Manufacturers, the Chamber of Commerce of the United States of America and the Information Technology Industry Council.

practical training." *Id.* at 465 (citations and internal quotation marks omitted). In particular, the district court determined that "the statute's lack of a definition for the term 'student' creates ambiguity." *Id.* (quoting in entirety *Washtech I*, 156 F. Supp. 3d at 139). At *Chevron* step two, the district court concluded that "the [2016 OPT Rule] is a reasonable interpretation of the F-1 statute." *Id.* at 475. The district court did not address whether another statutory provision independently provides adequate authority for post-completion OPT.[6]

## II. ANALYSIS

"We review *de novo* the District Court's grant of summary judgment," *Castlewood Prods., LLC v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004), and more precisely, because the district court in this case reviewed an agency action under the Administrative Procedure Act (APA), *see* 5 U.S.C. § 706(2)(C), '[w]e review the administrative record and give no particular deference to the District Court's views.'" *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 636 (D.C. Cir. 2021) (alteration in original) (quoting *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 329–30 (D.C. Cir. 2020)). We review the DHS's decision to promulgate the 2016 OPT Rule "under the familiar standards of the [APA], which require that we uphold the

---

[6] The DHS primarily relied on the F-1 statute and its "broad authority" under 8 U.S.C. § 1184(a)(1) "to determine the time and conditions under which nonimmigrants, including F–1 students, may be admitted to the United States." 2016 OPT Rule, 81 Fed. Reg. at 13,044–45. It also cited 8 U.S.C. § 1324a(h)(3) as statutory support for the assertion that the Secretary "has broad authority to determine which individuals are authorized for employment in the United States." *Id.* at 13,045. The district court only held that the F-1 statute authorizes OPT and did not mention whether section 1324a(h)(3) additionally or independently authorizes the program. *See Washtech VI*, 518 F. Supp. 3d at 475.

[agency's] decision unless it is . . . 'in excess of statutory jurisdiction, authority, or limitations.'" *Id.* (citing 5 U.S.C. § 706(2)).

I first address whether the F-1 statute authorizes the DHS to promulgate the 2016 OPT Rule and to grant post-completion OPT.[7] I would hold that it does not, necessitating a reversal of the district court. Next, I address the other asserted statutory authorities for the 2016 OPT Rule and the OPT program and conclude that a remand is appropriate. *See infra* at Section II.B.

## A. THE F-1 STATUTE

The parties agree that the two-step *Chevron* framework applies to the F-1 statute analysis. Under this familiar framework, we first ask "whether Congress has directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984), and, if it has, we "give effect to [its] unambiguously expressed intent," *id*. at 843. If we instead find that the Congress has not spoken to the precise question at issue, we apply step two and examine whether the agency's interpretation "is based on a permissible construction of the statute." *Id.*

### 1.

I begin with the text. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and time again courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citations omitted)). Because "the plain language of [the F-1 statute] is

---

[7] As noted earlier, I agree with my colleagues' standing analysis and join it *in toto*.

'unambiguous,' '[the] inquiry [should] begin[] with the statutory text, and end[] there as well.'" *See Nat'l Ass'n of Mfrs. v. DOD*, 138 S. Ct. 617, 631 (2018) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)).

The F-1 statute, *see supra* at 2–3, includes three modifiers of the words "an alien" that effectively create requirements that a nonimmigrant must meet to qualify for F-1 status. The DHS may grant F-1 status to only an alien (1) "having a residence in a foreign country which he has no intention of abandoning," (2) "who is a bona fide student qualified to pursue a full course of study" and (3) "who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study." 8 U.S.C. § 1101(a)(15)(F)(i).

The DHS and the intervenors argue that the latter two requirements plausibly include on-the-job training and impose only *entry* requirements. *See, e.g.*, Appellee Br. 28–31. As the argument goes, the F-1 statute is silent as to the meaning of "student" and "course of study," which purportedly allows a reading that "an F-1 student's course of study . . . include[s] a period of post-graduation practical training in the student's field of study." *Id.* at 30; *see also* Intervenor Br. 15–16. As the district court concluded, *see Washtech I*, 156 F. Supp. 3d at 139, they argue that the inclusion of "seeks to enter" means that the F-1 statute's "bona fide student" and "course of study" requirements apply only at entry and that once the nonimmigrant qualifies for entry, the DHS has plenary authority to "formulat[e], by regulation, the 'conditions' for maintaining [F-1] status after entry." Intervenor Br. 16 (quoting 8 U.S.C. § 1184(a)(1)); *see also* Appellee Br. 31.

I am not so persuaded. Our court has previously interpreted the first modifier—"having a residence in a foreign

country which he has no intention of abandoning," 8 U.S.C. § 1101(a)(15)(F)(i)—as an ongoing requirement to maintain F-1 status. *See Anwo v. INS*, 607 F.2d 435, 437 (D.C. Cir. 1979) (per curiam). The intervenors argue that unlike the first requirement, the latter two requirements are set off by a comma, a syntactic distinction that, by their lights, differentiates the first as an ongoing requirement and the latter two as entry requirements. Intervenor Br. 23 n.5. Where the intervenors see a distinction, I see a list of three requirements and the omission of an Oxford comma. More to the point, the intervenors' minor syntactic distinction is of no help because in prioritizing syntax and separating the latter two modifiers from the first, the intervenors ignore critical portions of the text, leading to an "unnatural reading" of the F-1 statute. *See Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001); *see also United States v. Barnes*, 295 F.3d 1354, 1361 (D.C. Cir. 2002) ("In interpreting a statute, . . . we are to determine its true, natural meaning, where ascertainable, irrespective of cumbersome syntax."); *United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 82–83 (1932) ("To determine the intent of the law, the court, in construing a statute will disregard the punctuation, or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed." (citations omitted)).

The second modifier is also naturally read as an ongoing requirement because it contains no temporal restriction on its requirement that an F-1 visa holder must be "a bona fide student qualified to pursue a full course of study." *See* 8 U.S.C. § 1101(a)(15)(F)(i). Intervenors obliquely argue that the inclusion of "*qualified* to pursue a full course of study" indicates that the Congress was "looking to matters as of the date of entry." Intervenor Br. 16 (emphasis added by intervenors) (quoting 8 U.S.C. § 1101(a)(15)(F)(i) in the first quotation). Of course, the potential F-1 visa holder must

"qualif[y]" for admission into the United States but there is nothing in the text of this modifier indicating that once admitted, the F-1 visa holder may stop being a student. To the contrary, the text reads "an alien . . . , who *is* a bona fide student," without mentioning entry at all. 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added). Even the DHS seems to acknowledge the ongoing nature of this requirement. *See* Oral Arg. Tr. 32:4–23 (DHS noting that because "some of the September 11 attackers" entered on F-1 visas, the Congress put the "onus on the universities to report students who were not complying or were not going to classes, because at that point they were out of status").[8] Moreover, reading the second and third requirements as entry-only requirements makes superfluous the "is" in the "is a bona fide student" requirement. Interpreting the second requirement as an ongoing requirement, however, "gives effect to every clause and word of [the F-1] statute." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (some internal quotation marks omitted).

To support its entry-only-requirement interpretation, the DHS primarily relies on the third modifier's use of "seeks to enter" and on absurdly overbroad interpretations of "student" and "course of study." *See* 8 U.S.C. § 1101(a)(15)(F)(i) (requiring an F-1 visa holder to be, *inter alia*, an "alien . . . who seeks to enter the United States temporarily and *solely* for the

---

[8] The intervenors also seem to acknowledge that "student" or "course of study" constrain the DHS's authority after entry. They argue that "[a]fter a graduate reaches a certain point in his or her career, continued employment would cease to be 'reasonably related' to the educational 'purposes' of the F-1 statute, and would no longer be permitted." Intervenor Br. 20 (quoting *Doe, 1 v. FEC*, 920 F.3d 866, 871 (D.C. Cir. 2019)). Where this point may be is undisclosed but they concede that the educational aspects of the statute— "student" and "course of study"—are not entry-only requirements.

purpose of pursuing such a course of study" (emphasis added)). The DHS argues that the "textual focus on the 'purpose' for which one 'seeks to enter'" makes the third requirement an "initial requirement of admission," not a "continuing requirement." Appellee Br. 31 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)) (alteration accepted). It also argues that because the Congress did not define "student" or "course of study," the legislature left it up to the "DHS 'to [reasonably] fill the statutory gap'" and that "the statutory language naturally lends itself to the reading that a student could be permitted to work as part of his 'course of study.'" Appellee Br. 16 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)), 30 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)). I cannot join in this tortured interpretation—what Holmes dubbed "verbicide" [9]—of "seeks to enter" and "student."

In view of "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," however, "student" and "course of study" cannot reasonably be read to include post-completion OPT. *See United States v. Wilson*, 290 F.3d 347, 353 (D.C. Cir. 2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). Read in its entirety, the statute places a key limitation on the "course of study" referenced in both the second and third requirements; it requires that the course of study be "at an established college, university . . . or other academic institution . . . , which institution or place of study shall have agreed to report to the [Secretary of Homeland Security] the termination of attendance of each nonimmigrant student." 8 U.S.C.

---

[9] "Life and language are alike sacred. Homicide and verbicide—that is, violent treatment of a word with fatal results to its legitimate meaning, which is its life—are alike forbidden." OLIVER WENDELL HOLMES, SR., THE AUTOCRAT OF THE BREAKFAST-TABLE (1858).

§ 1101(a)(15)(F)(i). Accordingly, because post-completion OPT occurs after "attendance" "at an academic institution" has concluded, the definition of "course of study" affirmatively excludes those who "study" other than at academic institutions and thus those engaged in post-completion OPT. That leaves "student" and "seeks to enter" as the only statutory hooks supporting post-completion OPT.

The district court referenced two definitions of "student" and determined that "while some definitions of the word 'student' require school attendance, most include broader notions of studying and learning." *Washtech VI*, 518 F. Supp. 3d at 467 (cleaned up) (citing *Student*, MERRIAM-WEBSTER DICTIONARY ONLINE, www.merriam-webster.com/dictionary/student and *Student*, OXFORD ENG. DICTIONARY, www.oed.com (visited Jan. 10, 2021)) **[J.A. 25.]**. Granted, "student" in other contexts can have a broader meaning, *cf. Student*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY (2d ed. 1950) ("A person engaged in study; one devoted to learning; a learner; a scholar; esp., one who attends a school, or who seeks knowledge from teachers or books"), but the explicit academic-institution attendance requirement of a "course of study" in which the student is engaged narrows the meaning of "student" in the F-1 statute to include only those who have yet to "terminat[e] [their] attendance" "at an . . . academic institution," 8 U.S.C. § 1101(a)(15)(F)(i); *see also Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 25 (D.C. Cir. 2015) ("General-usage dictionaries cannot invariably control our consideration of statutory language, especially when the 'dictionary definition of . . . isolated words[] does not account for the governing statutory context.'" (quoting *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010)). I am at a loss to see ambiguity in "student" that would capture post-graduation *employment*.

15

As for the "seeks to enter" modifier, *see* 8 U.S.C. § 1101(a)(15)(F)(i) (requiring an F-1 visa holder to be, *inter alia*, an "alien . . . who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established . . . academic institution . . . , which institution or place of study shall have agreed to report to the [Secretary of Homeland Security] the termination of attendance of each nonimmigrant student"), the parties again diverge on whether this language establishes an ongoing obligation or an entry-only requirement to attend an academic institution. I see the third modifier as an ongoing requirement but under either approach, I fail to see how it transforms the second requirement into entry-only requirement. *See Ala. Power Co. v. EPA*, 40 F.3d 450, 455 (D.C. Cir. 1994) ("Statutory text is to be interpreted to give consistent and harmonious effect to each of its provisions.").

The ongoing nature of the first two requirements necessarily informs the reading of the third's "seeks to enter" language. *See* 8 U.S.C. § 1101(a)(15)(F)(i) (requiring an F-1 visa holder to be, *inter alia*, an "alien . . . who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study . . . at an established . . . academic institution . . . , which institution or place of study shall have agreed to report to the [Secretary of Homeland Security] the termination of attendance of each nonimmigrant student"). As the DHS reads the statute, the "seeks to enter" provision provides the DHS plenary authority to define "student" and "course of study" to allow F-1 visa holders to stay and work for years beyond their "termination of attendance" at "an academic institution." *See* Appellee Br. 30–31. As already described, however, "student" and "course of study" take on specific meanings that the second requirement extends beyond admission. Far from expanding the DHS's authority after admission, the language in the "seeks to enter"

modifier confirms the ongoing limits on F-1 status set by the first two modifiers. In particular, "temporarily" and "solely for the purpose of pursuing such a course of study" and the "attendance" requirement manifest that there are limits to the duration of stay, to who qualifies as a "student" and to what counts as a "course of study." *See* 8 U.S.C. § 1101(a)(15)(F)(i). Moreover, even assuming *arguendo* that the third requirement is an entry-only requirement, it does not follow that the second requirement—"is a bona fide student"—is also an entry requirement. That misreading is belied by the text itself and would impermissibly rewrite the statute by inserting entry language where none exists. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite [a] statute."). Accordingly, the second requirement serves as an ongoing constraint on maintaining F-1 status, even if, again, *arguendo*, the third is only an entry requirement.

**2.**

Reading the "seeks to enter" modifier to transform the F-1 statute into an entry-only requirement is also incompatible with the structure and text of the INA. First, the F-1 statute details that a nonimmigrant may enter "solely for the purpose of pursuing such a course of study . . . at an established . . . academic institution," 8 U.S.C. § 1101(a)(15)(F)(i), and the INA separately requires that all DHS regulations placing conditions on a nonimmigrant's admission must, *inter alia*, "insure that . . . upon failure to maintain the status under which he was admitted , . . . such alien will depart from the United States," *id.* § 1184(a)(1). In other words, because the "solely" requirement is an ongoing part of the nonimmigrant's "status under which he was admitted" but the 2016 OPT Rule permits F-1 visa holders to stay past the completion of their "course of study," the DHS exceeded its statutory authority by expanding

F-1 status to include those *not* "solely . . . pursuing a course of study" at an academic institution.

Second, interpreting the "seeks to enter" modifier as an entry-only requirement is inconsistent with its use elsewhere in the INA. To wit, similar to the "attendance" and the "academic institution" limitations on "student" and "course of study," the "seeks to enter" modifier in the K-1 visa provision, which gives nonimmigrant status to the fiancé of a U.S. citizen, includes an ongoing requirement that the fiancé complete the marriage "within ninety days after admission." 8 U.S.C. § 1101(a)(15)(K)(i); *see Birdsong v. Holder*, 641 F.3d 957, 958 (8th Cir. 2011) (interpreting "seeks to enter" provision as ongoing requirement of maintaining status after admission); *see also Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1066 (9th Cir. 2008) (interpreting managerial-capacity requirement as ongoing requirement notwithstanding "seeks to enter" modifier in 8 U.S.C. § 1101(a)(15)(L)).

Finally, interpreting "seeks to enter" as an entry requirement effectively removes any statutory constraint on the DHS's authority after admission. Unsurprisingly, the DHS sees this discretion as a feature, not a bug. But the interpretation leads to an incongruous result when read in conjunction with the rest of the INA. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). For instance, the M-1 visa, which applies to vocational students, includes the continuing residency modifier and the "seeks to enter" modifier in language almost identical to the F-1 statute. *See* 8 U.S.C. § 1101(a)(15)(M)(i). Accordingly, if "seeks to enter" provisions apply at admission only, there is no statutory constraint on who may qualify for an M-1 visa as long as he continues to "hav[e] a residence in a

foreign country which he has no intention of abandoning." *See id.* Moreover, the DHS interpretation has led to post-completion OPT rivaling the H-1B visa as the largest highly skilled guest worker program. Indeed, in 2016, the year in which the DHS authorized the twenty-four-month STEM extension, post-completion OPT surpassed the H-1B visa program as the greatest source of highly skilled guest workers. Neil G. Ruiz & Abby Budiman, *Number of Foreign College Graduates Staying in U.S. to Work Climbed Again in 2017, but Growth Has Slowed*, PEW RSCH. CTR. (July 25, 2018). This makes the DHS interpretation even more unlikely given the long history of statutory caps on the number of H-1B visas. *See* 8 U.S.C. § 1184(g)(1) (general caps), 1184(g)(5) (creating exceptions to caps, including separate quota of 20,000 for nonimmigrants with master's or higher degree). The DHS's assertion of authority in this case creates an exception that swallows the Congress's caps. As the Supreme Court has consistently reminded us, "absurd results are to be avoided and internal inconsistencies in the statute must be dealt with." *United States v. Turkette*, 452 U.S. 576, 580 (1981) (citations omitted). The entry-only requirement interpretation accomplishes neither of these statutory-interpretation goals.[10]

---

[10] The district court and DHS rely extensively on legislative history and the theory of congressional ratification or acquiescence. *See Washtech VI*, 518 F. Supp. 3d at 471 n.14; Appellee Br. 4–5, 15–17. But "[g]iven the straightforward statutory command [described *supra*], there is no reason to resort to legislative history," which in this case "muddies the waters." *United States v. Gonzales*, 520 U.S. 1, 6 (1997). As the DHS stated at oral argument, the "best" piece of legislative history supporting its notion that the Congress envisioned post-completion OPT in drafting the F-1 statute is a Senate Report from 1950 before the INA's 1952 enactment. *See* Oral Arg. Tr. 29:1–7; *see also* Appellee Br. 34 (citing S. REP. NO. 81-1515, at 503 (1950) ("[P]ractical training has been authorized for 6 months after

19

There is no dispute that the DHS, via its 2016 OPT Rule, believes that it has the authority to allow F-1 students to stay and work for up to three years after completion of their "course of study . . . at an established college, university . . . or other academic institution." 8 U.S.C. § 1101(a)(15)(F)(i); *see, e.g.*, 2016 OPT Rule, 81 Fed. Reg. at 13,045 ("[A]n F–1 student in post-completion OPT does not have to leave the United States within 60 days after graduation, but instead has authorization to remain for the entire post-completion OPT period."), 13,087 ("The 24-month [STEM] extension, when combined with the 12 months of initial post-completion OPT, allows qualifying STEM students up to 36 months of [OPT]."). Because the F-1

completion of the student's regular course of study.")). The Senate Report, however, conflicts with a contemporary House Report indicating that legislators assumed those on a student visa were "not permitted to stay beyond the completion of their studies." H.R. REP. NO. 82-1365, at 40 (1952). The district court ignored the danger of using legislative history as it neglected to consider conflicting legislative history relied on by Washtech. *See* Pl. Mot. for Summ. J. at 3, *Washtech VI*, 518 F. Supp. 3d 448 (citing H.R. REP. NO. 101-723, at 66 (1990); S. REP. NO. 96-859, at 7 (1980)).

As for congressional acquiescence, at whichever *Chevron* stage it may apply, *see* Appellee Br. 46–53 (evaluating acquiescence at *Chevron* step two); Intervenor Br. 24–41 (using acquiescence at *Chevron* step one), it does not apply here. "Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991); *see also Brown v. Gardner*, 513 U.S. 115, 122 (1994) ("A regulation's age is no antidote to clear inconsistency with a statute . . . ."). Because the DHS's reading of the F-1 statute contravenes the statute's plain meaning, I cannot understand how the Congress has "agreed with" that reading. *See Brown*, 513 U.S. at 121 ("[C]ongressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute." (internal quotation marks and citations omitted)).

statute is plainly not an entry-only requirement, its constraints on F-1 nonimmigrant status are ongoing, making the DHS's 2016 OPT Rule "in excess of [its] statutory . . . authority." 5 U.S.C. § 706(2)(C). Accordingly, I would reverse the district court and remand for further consideration, as explained *infra*.[11]

## B. OTHER STATUTORY AUTHORITY

As briefly mentioned by the district court, *Washtech VI*, 518 F. Supp. 3d at 468–69, Washtech also argues that the DHS's separate statutory authority for its action, 8 U.S.C. § 1324a(h)(3), is inadequate to uphold the 2016 OPT Rule. *See* Appellant Br. 27–32; Appellant Reply Br. 9–14; *see also* 2016 OPT Rule, 81 Fed. Reg. at 13,044–45 (asserting 8 U.S.C. §§ 1103, 1184(a)(1) and 1324a(h)(3) as statutory authorities).[12] In particular, Washtech argues that section 1324a(h)(3)'s definition of "unauthorized alien" confers on the DHS only the authority to issue work authorizations expressly authorized by statute, not independent authority to authorize the employment of any alien. Washtech provides two grounds for its argument. Washtech first argues that the structure of the INA supports its

---

[11] After oral argument, the Supreme Court decided *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). The implication of that decision is that the major questions inquiry appears to be a threshold question to *Chevron* analysis. Because I believe that this dispute may be a major question, I would either ask for supplemental briefing to us or direct the district court on remand to treat the applicability of *West Virginia* to the 2016 OPT Rule.

[12] Recall that it is unlawful to employ "an unauthorized alien," as defined by section 1324a(h)(3). 8 U.S.C. § 1324a(a)(1)(A). Section 1324a(h)(3) in turn states that an alien is *not* "unauthorized" to work if "lawfully admitted for permanent residence, or . . . authorized to be so employed by this chapter or by the [Secretary of Homeland Security]."

interpretation of section 1324a(h)(3) and that the Congress would not have delegated the elephant-sized "co-equal power to authorize alien employment" through a mousehole-sized definitional provision. Appellant Br. 29–30 (citing, *inter alia*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Second, Washtech argues that the DHS's section 1324a(h)(3) interpretation, which would purportedly allow the DHS to authorize employment for any alien class, violates the nondelegation doctrine. *Id.* at 30–31.

For its part, the DHS asserts almost in passing that section 1324a(h)(3)'s language— "authorized to be so employed by this chapter or by the [Secretary of Homeland Security]"— plainly confers on DHS the authority to authorize employment, unless a statute "expressly prohibit[s]" such authorization. Appellee Br. 17, 49–50. Expanding on the DHS's argument, the intervenors argue that the INA's general delegation of authority—to "establish such regulations . . . and perform such other acts as [the Secretary] deems necessary for carrying out his authority under the [INA]," 8 U.S.C. § 1103(a)(3), and to promulgate regulations establishing the "conditions" of admission for nonimmigrants, *id.* § 1184(a)(1)—includes work authorization. Intervenor Br. 43–45. They also argue that with the enactment of the IRCA, the Congress ratified the DHS's broad authority to authorize employment for any alien. *Id.* at 45–52.

I would not reach the merits of this dispute. Neither the district court, nor any of the parties, explained how a post-completion OPT program based on section 1324a(h)(3) only— independent of the F-1 statute and F-1 status—would operate. The district court's brief analysis of section 1324a(h)(3) assumed that the F-1 statute provided adequate statutory authority and thus did not address whether section 1324a(h)(3) independently provides sufficient statutory authorization for

post-completion OPT. *See Washtech VI*, 518 F. Supp. 3d at 468–69 ("[T]he [2016 OPT Rule] only grants work authorization to nonimmigrant foreign nationals who are already legally present in the United States under the F-1 student visa program.").

Accordingly, in assessing section 1324a(h)(3) authority, I would instruct the district court to decide whether F-1 status is severable from the post-completion OPT program. Severability requires examining whether there is "'substantial doubt' that the agency would have adopted the severed portion [of an agency action] on its own," *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (per curiam) (citations omitted), and whether the non-offending "part[] of the agency action can 'function sensibly without the stricken provision,'" *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022) (quoting *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019)). I believe "substantial doubt" exists as to whether the DHS *could* have adopted post-completion OPT if the participant aliens lacked F-1 status, *see Davis Cnty. Solid Waste Mgmt.*, 108 F.3d at 1459, because the entire premise of post-completion OPT is that the "workers" are "students," *see, e.g.*, 2016 OPT Rule, 81 Fed. Reg. at 13,117 (stating that "a qualified [STEM] *student* may apply for an extension of OPT while in a valid period of post-completion OPT authorized under 8 C.F.R. 274a.12(c)(3)(i)(B)," which in turn authorizes employment of a "nonimmigrant (F–1) student" (emphasis added)); *id.* at 13,040 (describing in "Purpose of the Regulatory Action" that "[t]his final rule affects certain F–1 nonimmigrant students who seek to obtain an extension of [OPT] based on study at a U.S. institution of higher education in a [STEM] field, as well as certain F–1 nonimmigrant students who seek so-called Cap-Gap relief").

Moreover, far from "function[ing] sensibly," the post-completion OPT program would not function at all if the participants lacked F-1 status. *See Carlson*, 938 F.3d at 351. The 2016 OPT Rule includes that "[a] student who violates his or her F–1 status during the STEM OPT extension period . . . will not be able to continue working during the pendency of [a] reinstatement application; such employment would be considered unlawful." 81 Fed. Reg. at 13,099. If it is unlawful to work without F-1 status, it is hard to see how anyone applying for a twenty-four-month STEM extension without F-1 status could receive authorization. Further, DHS regulations set out three classes of aliens authorized to obtain employment: (a) "Aliens authorized employment incident to status"; (b) "Aliens authorized for employment with a specific employer incident to status or parole"; and (c) "Aliens who must apply for employment authorization." 8 C.F.R. § 274a.12. In those regulations, the only mentions of post-completion OPT appear under subsections for "nonimmigrant (F–1) student[s]." *See* 8 C.F.R. § 274a.12(b)(6), (c)(3). Even on its own terms, therefore, the DHS could not grant work authorization to OPT participants sans F-1 status unless it amends its employment classifications—an agency action not before us. *See MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001) (holding "entire rule must be vacated" because severing only unlawful aspects "would severely distort the [agency's] program and produce a rule strikingly different from any the [agency] had ever considered or promulgated in the lengthy course of these proceedings").

On remand, the district court should also treat the effect of *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), on the section 1324a(h)(3) analysis. *See supra* note 11. In that decision, the Supreme Court determined that a certain section of the Clean Air Act did not give the EPA the authority to require, by regulation, energy generators to shift from higher- to lower-

emitting generation. *West Virginia*, 142 S. Ct. at 2616. Relying on "[1] the 'history and the breadth of the authority that [the EPA] ha[d] asserted[;]' . . . [2] the 'economic and political significance' of that assertion," *id.* at 2608 (quoting *Brown & Williamson*, 529 U.S. at 159–60); and [3] the principle that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s]," *id.* at 2609 (alteration in original) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)), the Court held that the case was a "major questions case," *id.* at 2610, and required the government to "point to 'clear congressional authorization'" of the regulatory action, *id.* at 2614 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Because the relevant section of the Clean Air Act did not "clear[ly] delegat[e]" to the EPA the authority to force generation shifting, *id.* at 2616, the Court determined that the EPA lacked the statutory authority to issue the generation-shifting regulation, *id.* at 2615–16. As in *West Virginia*, section 1324a(h)(3), a definitional provision, may well be too "subtle [a] device" and a "'wafer-thin reed' on which to rest" post-completion OPT, 142 S. Ct. at 2608–09 (quotation omitted), which, in 2016, surpassed the H-1B program as the largest highly skilled guest worker program, Ruiz & Budiman, *supra*. Moreover, as to breadth, the twenty-four-month STEM extension triples the amount of time that STEM F-1 graduates may stay in the country—an alarming expansion of DHS authority under the F-1 statute. Like the EPA's asserted authority in *West Virginia*, *see* 142 S. Ct. at 2612, the limit of the DHS's asserted authority is unclear; if the DHS's authority to authorize employment is as broad as the intervenors suggest, the DHS could extend post-graduate OPT beyond sixty months, which would be greater than the *statutory* limit for H-1B visa holders.

For the foregoing reasons, I respectfully dissent.